### CITY OF MOORHEAD v. UNION LIGHT, HEAT & POWER CO.

(District Court, D. Minnesota, Sixth Division. October 26, 1918.)

GAS ☞14(1)—CONTRACT WITH GAS COMPANY—SPECIFIC ENFORCEMENT.

 A gas company which has contracted to furnish gas to a city and its inhabitants for a term of ten years at fixed rates cannot be given the right by a court of equity to violate its contract and increase its rates because war conditions have rendered them unprofitable.

In Equity. Suit by the City of Moorhead against the Union Light, Heat & Power Company, with cross-bill. On motions by each party for preliminary injunction and by complainant to dismiss cross-bill. Motions of complainant granted.

James A. Garrity, of Moorhead, Minn., for plaintiff.

Denegre & McDermott, of St. Paul, Minn., and A. W. Fowler, of Fargo, N. D., for defendant.

AMIDON, District Judge. Plaintiff, the city of Moorhead, is a municipal corporation operating under a home rule charter adopted by its people March 22, 1900. That charter (section 223), provides that every ordinance by which the council shall propose to grant any franchise shall contain all the terms and conditions of the franchise, and it shall be a feature of every franchise so granted that the maximum price of the service shall be stated in the grant, and before the ordinance shall become effective it shall be submitted to, and approved by, the qualified voters of the city.

On the 6th day of May, 1912, an ordinance granting the defendant, the Union Light, Heat & Power Company, a franchise for the purpose of distributing gas for the term of ten years, was adopted by a majority of the voters of the city. It was accepted in writing on August 22d. Section 6 of this ordinance fixes the maximum price of gas at not to exceed $1.80 per thousand cubic feet for illuminating, and $1.45 per thousand cubic feet for fuel purposes. Defendant has since been supplying gas to the city and its inhabitants under this franchise at the rates agreed upon. Its plant is located in the city of Fargo, in the state of North Dakota, and it supplies gas to that city and its inhabitants, as well as to the plaintiff.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

August 22, 1918, defendant served upon the city of Moorhead written notice that the rates for gas for all purposes from and after September 1st would be $2 per thousand cubic feet.

On the 30th of August the bill in this suit was filed in the state court for the county of Clay, in which the city of Moorhead is located. The pleading sets forth a history of the relations between the parties, as above stated, and the threat of the defendant to increase its rates and to discontinue its service unless the increased rate was accepted. It prays for a temporary injunction to restrain this violation of the ordinance, and for a permanent injunction upon the hearing of the case.

Defendant has filed an answer and cross-bill. It admits the allegations of the complaint, but alleges that owing to the European War all the elements entering into the cost of manufacturing and distributing gas have been so greatly increased that it cannot supply gas at the rates fixed by the ordinance except at an actual loss; sets forth in detail the elements of such increased cost, and facts tending to show that the ordinance rate when applied to the business of the company for the year 1918 leaves nothing by way of providing for depreciation or interest on the investment, and, as this process has been steadily growing worse since the beginning of the war, the bill charges that a continuance of the rate will result in an actual loss to the company even if depreciation and interest on the investment are disregarded. The bill further states that its gas business supplying both Fargo and Moorhead is operated as a single enterprise, and that the rates for both cities ought to be the same, and that, for the reasons set forth in the cross-bill, the rates in Fargo have been fixed and accepted at $2, and that it is both impracticable and unjust to supply gas to the city of Moorhead and its inhabitants at a lower rate than obtains in the neighboring city.

The cross-bill prays that the provision of the ordinance fixing the maximum rate be declared to be null and void, and that plaintiff be enjoined from enforcing its provisions, and from attempting to compel defendant to furnish gas to plaintiff, or its inhabitants, at those rates.

While the case was pending in the state court, a temporary injunction was granted on plaintiff's motion. Thereafter the cause was removed into this court by defendant on the ground of diversity of citizenship. Plaintiff moves that the temporary injunction in the state court be continued, and that the cross-bill be dismissed upon the ground that it states no facts entitling the defendant to relief in equity. Defendant moves that the temporary injunction granted by the state court be set aside, and that a temporary injunction be issued by this court in accordance with the prayer of the cross-bill.

The meat of the case is this: Does the fact that defendant's contract with the city has, by reason of the European War, become unprofitable, justify the court in releasing defendant from the contract? Does a public utility company, which contracts to supply the public with a commodity like gas or electricity, occupy a different position from other contractors who have agreed to supply articles the cost of which have been greatly enhanced by the war? Is a public utility company

entitled to modify its contract whenever a change is necessary in order to make performance profitable? When cities are expressly vested with power to enter into contracts as to rates, it is now established by repeated decisions of the Supreme Court that such contracts are binding upon the city even though the public utility company may make extortionate profits therefrom. Detroit v. Detroit, etc., Ry. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592; Vicksburg v. Vicksburg Water Co., 206 U. S. 496, 27 L. Ed. 762, 51 L. Ed. 1155; Home Telephone Co. v. Los Angeles, 211 U. S. 265, 273, 29 Sup. Ct. 50, 53 L. Ed. 176. Public utility companies are insistent that their rights under such contracts be protected by the courts against every attempt of the state or city to reduce rates, and when the city's power to make the contract is clear the courts have uniformly restrained their violation. If such be the law in favor of public utility companies, why should not the converse be equally true, and such companies be compelled to perform their contracts even though they may result in a loss?

It is easy to confuse this case with the cases which have usually been brought before courts by utility companies. Such companies usually come into court upon the following state of facts: They have received a franchise from the city, fixing the rate for their service. At a subsequent date the city in the exercise of its police power reduces those rates, and the company then asserts that the new rates are confiscatory; that is, are so low as not to yield a reasonable profit upon the value of the property devoted to the service. As against all such reductions, the company is protected by the Fourteenth Amendment of the Constitution against rates being made so low as not to pay a reasonable profit. Such, however, is not the present case. Here there has been no reduction by the city of the franchise rates. It simply stands upon its contract and asks protection against the rates being raised by the company. The party who is changing the franchise rates now is, not the city, but the public utility, and the city is only asking the court to compel the company to perform its contract and furnish gas at the rates for which the company has agreed to be bound.

It is conceded in argument that the rule in the federal courts in actions at law is that a party is bound by his contract, though performance results in loss. That is settled by the Court of Appeals of this circuit in the recent case of Berg v. Erickson, 234 Fed. 817, 148 C. C. A. 415, L. R. A. 1917A, 648. From a careful review of the authorities, Judge Sanborn there states that in some of the state courts a rule has been developed that, when conditions arise of such a character that the court can say that they were not within the contemplation of the parties at the time the contract was made, such a change of situation will excuse a violation of the contract. He concludes, however, as follows:

"But no decision of the Supreme Court or of any federal court to this effect has been cited or discovered which goes so far, and the rule adopted by the Supreme Court, which must prevail here, is otherwise."

He cites many federal authorities in support of the strict rule. Among them are Dermott v. Jones, 2 Wall. 1, 17 L. Ed. 762; The

Harriman, 9 Wall. 161, 172, 173, 19 L. Ed. 629; Jones v. United States, 96 U. S. 24, 29, 24 L. Ed. 644; Chicago, etc., Ry. Co. v. Hoyt, 149 U. S. 1, 14, 15, 13 Sup. Ct. 779, 37 L. Ed. 625.

Conceding this to be the rule at law, counsel for defendants insist that the rule in equity is different, and that a court of equity will not specifically enforce a contract when a change in the situation has occurred of such a character that the parties at the time of making the contract did not have it in contemplation. Controlling decisions of the federal courts, however, are also fatal to this contention. The question has been directly passed upon, and contracts much more inequitable than the one here involved were enforced in the following cases: Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; Franklin Telegraph Co. v. Harrison, 145 U. S. 459, 471, 12 Sup. Ct. 900, 36 L. Ed. 776; Guffey v. Smith, 237 U. S. 101, 115, 35 Sup. Ct. 526, 59 L. Ed. 856. These cases all decide that in determining whether equitable relief should be granted with respect to a contract the court must place itself in the position occupied by the parties at the time the contract was made, and not at the time at which it is to be performed. If at the time it was made the contract was fair and free from fraud, mistake, or imposition, parties must be left free to make their contracts, and it is the duty of courts to enforce them as made. The same doctrine has been applied to contracts between municipalities and public utility companies. Logansport, etc., Gas Co. v. Peru (C. C.) 89 Fed. 185; Muncie Natural Gas Co. v. Muncie, 160 Ind. 97, 66 N. E. 436, 60 L. R. A. 822; Westfield Gas & Mining Co. v. Mendenhall, 142 Ind. 538, 41 N. E. 1033; Pond on Public Utilities, §§ 431, 432.

The contract between plaintiff and defendant is for a comparatively short term. The conditions which cause the hardship are not permanent, and are certainly not greater than those which frequently arise in contracts between private corporations and individuals. In the case of In re Janvrin, 174 Mass. 514, 55 N. E. 381, 47 L. R. A. 319, Mr. Justice Holmes, speaking for the Supreme Court of Massachusetts, held that contracts between public utilities companies and corporations for a brief term, so as to give to both parties peace and an established status, were reasonable, and when made should be enforced by courts.

I am therefore unable to find any ground, either in law or equity, that would justify the court in excusing defendant from complying with its contract.

It is finally urged that the franchise is not mandatory but permissive, and that the company has a right at any time to withdraw from performance when performance will entail an actual loss. There are numerous decisions which have held that street railway companies may withdraw their service from a limited section under the circumstances named. My attention has not been called to any case authorizing a public utility company to withdraw from supplying an entire city with a commodity like gas or electricity. I shall not attempt to determine at this time whether defendant possesses such a right. If any such right exists, it would need to be carefully safeguarded. The public has rights in such a case as well as the company. The service cannot be

suddenly and arbitrarily withdrawn. It should not be withdrawn except upon a clear notice of intention to withdraw given for such a time as under the circumstances of the case will enable the municipality to contract with another private company to supply the commodity, or enable the municipality to erect a plant and furnish the article for itself and its inhabitants. After a community has become accustomed to the use of gas or electricity, it cannot be suddenly thrown back and commanded to use oil lamps and coal ranges. It is entitled to sufficient notice to enable it, in the exercise of reasonable diligence, to secure the service from which the utility company has withdrawn.

The situation disclosed by the cross-bill, if it is a true picture of the actual effect of the rates upon defendant's business, is such as might lead a just man in private life to modify a contract. It is within the power of the city council to modify a contract. In states having a public utility commission vested with full authority to deal with the subject of rates, such, for example, as Massachusetts, New York, Wisconsin, and California, those commissions have exercised their powers to increase rates when they were unreasonably low just as freely as to reduce them when they were unreasonably high. Unfortunately there is no commission in the state of Minnesota clothed with such a power. The same is true in North Dakota. A commission which is powerless to protect the public is also powerless to protect the company. Relief against such a situation, however, can be found only in the Legislature, and will not justify courts in assuming legislative powers.

The temporary injunction granted by the state court will be continued in force, and the application of the defendant for an injunction upon its cross-bill will be denied, and the cross-bill dismissed for want of equity.