LENAWEE COUNTY GAS & ELECTRIC CO. *v.* CITY
OF ADRIAN.

1. MUNICIPAL CORPORATIONS—GAS RATES—FRANCHISE CONTRACTS
   —CONSTITUTIONAL LAW.
   If an ordinance fixing the price of gas to the consumers,
   accepted by both the municipality and the gas company,
   was in the first instance a valid binding agreement which
   the contracting parties were competent to make, the fact
   that it proved to be unprofitable to one of the parties
   would not render its enforcement by the other uncon-
   stitutional.

2. EQUITY—JURISDICTION—RELIEF FROM HARD BARGAIN.
   Equity does not relieve from hard bargains simply because
   they are hard, even though made so by the world war.

3. MUNICIPAL CORPORATIONS — PUBLIC UTILITIES — "REASONABLE"
   REGULATIONS—POWER TO CONTRACT AS TO RATES.
   Statutory power of a municipality to prescribe "reasonable"
   regulations for a public utility, *held,* to carry with it
   authority to contract as to rates.

4. SAME—"RATES"—CONTRACT AND LEGISLATIVE DEFINITION.
   The word "rates" may be said to denote the price stated
   or fixed for some commodity or service of general need
   or utility supplied to the public, measured by a specified
   unit or standard and classified as contract or adminis-
   trative rates when voluntarily fixed or agreed upon be-
   tween the contracting parties, and as legislative rates
   when fixed by the legislature or its authorized agency
   without consent or agreement of the parties.

5. STATUTES—RATE-MAKING A LEGISLATIVE FUNCTION.
   It is a well settled principle of law that rate-making in
   matters of public utilities is a legislative function.

6. SAME—PRESUMPTIONS.
   Laws are assumed to be enacted by the legislative body
   with some knowledge of and regard to existing laws upon
   the same subject and decisions by the court of last resort
   in reference to them.

On power of municipality to fix gas rates as an incident of
its power to authorize the laying of gas mains, see note in 18
L. R. A. (N. S.) 1197.

7. Municipal Corporations—Power to Fix Rates Recognized by Inference—Public Utilities Commission.

That by Act No. 419, Pub. Acts 1919, creating the public utilities commission, and giving it power to fix "rates and charges of all public utilities within this State producing, transmitting, delivering, or furnishing gas for heating or lighting purposes for the public' use," the legislature prohibited altering, without consent of the interested municipality and company, any franchise or agreement relative to rates, gives room for possible inference of ratification or at least approval of contract relations between those bodies touching rates.

8. Same—Rates—Reasonableness Relates to Time of Contracting.

If the validity of a franchise contract as to rates depends on the agreed rates being reasonable, it follows from the fact that there was a contract that the question of whether it was reasonable must relate to the time the contract was entered into.

9. Same—Equity—Gas—Rates—Injunction—Relief from Hard Contract.

Where the city of Adrian entered into a franchise contract with the gas company fixing the gas rates for said city which were reasonable at the time said contract was made, the equity court will not grant injunctive relief to said company by restraining said city from enforcing the contract.

Appeal from Lenawee; Hart (Burton L.), J. Submitted January 27, 1920. (Docket No. 98.) Decided February 27, 1920.

Bill by the Lenawee County Gas & Electric Company against the city of Adrian and others to enjoin the enforcement of an ordinance fixing gas rates. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Pam & Hurd* and *Baldwin & Alexander,* for plaintiff.

*Henry R. Jewett* and *John C. Howell,* for defendants.

STEERE, J.   Plaintiff is a public service corporation engaged in supplying the city of Adrian and its inhabitants with gas.   Defendants are the city of Adrian and certain of its officials who are said in plaintiff's brief to have been joined with the city as defendants "both in their capacity as such officials and as consumers of gas representing the large body of such consumers."

Plaintiff filed this injunction bill, directed primarily against the city, to restrain enforcement of an ordinance which specifies the rates which may be charged for gas; and in that particular to have such ordinance adjudged illegal and void because such rates as fixed have become so relatively low and unreasonable as to be in effect confiscatory and their imposition operates to deprive plaintiff of its property for public use without just compensation, due process of law, etc.; and the city did not in the first instance possess power to fix rates by contract or otherwise except that they be and continue reasonable.   On application for a temporary injunction an order to show cause was issued and defendants filed answer to both the order and bill.   A hearing was had in which defendants' pleadings were accepted by common consent as a motion in the nature of a demurrer to dismiss plaintiff's bill, which was argued.

The contentions on both sides are well pleaded and it may fairly be said on plaintiff's theory of no binding contract, that the allegations in its bill state existing conditions fairly showing grounds for equitable relief.   To that point counsel urge in its behalf that the rates fixed by ordinance, though accepted by the company, do not constitute such an unalterable binding contract as to be enforceable when it is clearly shown that the same have become, through changed conditions, palpably unreasonable, even though reasonable at the time the so-called franchise contract was entered into.

Plaintiff is successor to the Adrian Gas Company which was incorporated in 1856 under the so-called gaslight company act passed in 1855 (Act No. 109, Laws 1855), and from shortly thereafter it and its successor have continuously supplied the city of Adrian with gas, having the various rights and privileges given gas companies organized under general laws of the State. On August 12, 1901, the city of Adrian passed an ordinance giving the Adrian Gas Company the use of streets and other privileges customarily granted in such cases, fixing a rate to be charged for gas which was accepted in writing by the Adrian Gas Company. On April 9, 1908, the same was amended in certain particulars, including reduction of rates, and accepted in writing by the company. In March, 1912, the Adrian Gas Company transferred all its property, franchises, etc., to plaintiff, which has since owned and operated the property and business, supplying gas to the city and its inhabitants. On March 8, 1915, the gas ordinance of the city was again amended at the instance of and on a proposition made by plaintiff to the city in writing offering reduction of the rate for gas to $1.10 per thousand, supplied customers on the one meter plan with a discount of 10 cents per thousand for prompt payment, and furnish gas for city buildings at 90 cents per thousand, provided the city gave plaintiff a desired contract for lighting the "downtown and Tecumseh-street white way districts according to the terms, and for the sums specified in the attached proposals." This proposition was accepted by the city council. The ordinance was amended as suggested, accepted by plaintiff in writing, and a contract was entered into for lighting the two white way districts according to the terms plaintiff proposed. The city was then operating under a special charter granted by direct act of the State legislature, but soon thereafter adopted a new charter under the

home rule act with a commission form of city government.

In the summer of 1919 the company made application to the city commission for relief from the rate limit to which it was restricted by the amended ordinance of 1915, claiming that with its heavy bonded and floating indebtedness and the high prices labor and material had reached it would be impossible to continue operation of its plant for any considerable time unless a substantial increase was made in the rates it could charge for gas. Representatives of plaintiff appeared before the city commission and negotiations were carried on for a time in relation to the matter during which both the city commission and plaintiff's representatives were advised by the city attorney that under the home rule charter then in force the existing franchise ordinance could not be amended by the commission until after the proposed change had been approved by a three-fifths vote of the electors. An agreed form of proposed ordinance to amend section 8 of the old ordinance which covered the matter of rates was prepared, authorizing an increase of the charge for gas to $1.25 per thousand feet under specified conditions then tentatively acted upon by the city commission and under proper proceedings submitted to a vote of the electors, which failed of adoption, being defeated by a majority vote.

Failing in its efforts to obtain the desired relief by voluntary action of the electors or officials of the city, plaintiff filed this bill to enjoin enforcement of the ordinance on the ground—

"that section 8 of said ordinance of the city of Adrian as amended has become and is unreasonable, illegal, null and void, because the enforcement thereof would: (a) Deprive the plaintiff of its property without due process of law. (b) Take the plaintiff's property without just compensation. (c) Deprive the plaintiff of the equal protection of the law "

These constitutional grounds of objection are necessarily predicated on a lack of contractual power in the municipality to enter into a contract with plaintiff fixing the price it could charge for gas, as a contract is commonly understood to mean and is legally defined, for if the result of their accepted relations was in the first instance a valid binding agreement which the contracting parties were competent to make, the fact that it proved to be an unprofitable or losing contract to one of the parties could not render its enforcement by the other unconstitutional; neither does equity relieve from hard bargains simply because they are hard, even though made so by the world war. *Columbus, etc., Power Co.* v. *City of Columbus,* 249 U. S. 399 (39 Sup. Ct. Rep. 349) ; *City of Moorhead* v. *Heat & Power Co.,* 255 Fed. 920.

The key-note of plaintiff's contention is that, under our gaslight-company law and State Constitution, rates fixed by a city franchise must at all times be reasonable, setting a limitation on the municipality beyond which it cannot go by contract or otherwise, and that any rate fixed by franchise, although reasonable, satisfactory and agreed to by both parties at the time, cannot bind the contracting parties for the stipulated period of the franchise, or for any definite time, but whenever such rates in fact become unreasonable they become unlawful and unenforceable. This construction not unnaturally suggests the query whether such a contract becomes lawful and enforceable again when the pendulum swings the other way, and so on back and forth during the agreed life of the franchise.

Both "reasonable" and "rate," while words of frequent use, are relative terms of such varied and shaded meaning not only in the abstract but often in the particular connections used as to be difficult of exact definition and afford a broad field for controversy. It has been said that any attempt to give a specific mean-

ing to the word "reasonable" is like trying to count that which is not numbered, and its exact meaning when applied to particular subjects, in qualification of action or conduct, has been a topic of abundant discussion in legal text books and reported decisions.

Sufficient for the purposes of this case, as applied to the power of the city to enter into a contract for the rate at which gas should be supplied to the public, is the interpretation of "reasonable" in the connection used by Justice CARPENTER in *Boerth* v. *City Gas Co.*, 152 Mich. 654 (18 L. R. A. [N. S.] 1197), wherein statutory power to prescribe reasonable regulations is held to carry with it authority to contract as to rates.

Many definitions of the word "rate" are to be found, but as involved in the present controversy it can broadly be said to denote the price stated or fixed for some commodity or service of general need or utility supplied to the public, measured by a specified unit or standard. Such fixed prices are sometimes classified as contract or administrative rates voluntarily fixed or agreed upon between themselves by contracting parties, and legislative rates fixed by the legislature or its authorized agency as a paramount governmental function without consent or agreement of the parties.

It is a well settled principle of law that rate-making in matters of public utilities like that under consideration is a legislative function. Primarily the power to control and regulate rates rests with the legislature. With that unquestioned principle in mind it seems advisable to first consider the present state of the law upon that subject in this jurisdiction and note what has already been decided, for it would be inexpedient and serve no useful purpose to again review the many not unfamiliar authorities relative to rates cited from other jurisdictions and arguments of counsel based thereon directed largely, as we are impressed, to questions already disposed of in this State by our former decisions.

In *Mahan* v. *Telephone Co.*, 132 Mich. 242, the Michigan Telephone Company contested the validity of a claimed contract entered into by its predecessor with the city of Detroit. The city had no authority to exclude telephone companies from the use of its streets, possessing only the customarily conferred charter right to establish reasonable regulations and rules for their use. An ordinance was passed by the city council granting a franchise to the Detroit Telephone company, amongst other things fixing the maximum rate for telephone service charges and providing it should apply to any assignee or successor of said company. This was accepted by the Detroit Telephone company in writing. The Michigan Telephone Company denied the right of the city to fix rates. This court adopted and affirmed the opinion of the circuit court which held and said: "The right of the city to make the contract in the premises cannot be questioned."

In *Boerth* v. *City Gas Co.*, *supra*, the validity of a franchise contract fixing the rate which the company might charge the public for gas was directly in issue. The legal rights and relations of the parties were substantially the same as here. The gaslight company act under which each of the gas companies was organized give it—

"power to lay conductors for conducting gas  \*  \*  \* through the streets  \*  \*  \* of any city  \*  \*  \* where said corporation is located,  \*  \*  \* which pipes or conductors shall be laid with the consent of the municipal authorities of such cities,  \*  \*  \* through which the same are laid, under such reasonable regulations as they may prescribe."

Each city had in substance the same charter power to control and regulate the use of its streets. It was there conceded that the city of Detroit was vested with no legislative power to determine and impose rates, but said that the "power to prescribe rates by

contract—that is the power which was exercised in this case—is a very different power from the legislative power of regulating rates." The court pointed out the distinction between the legislative or governmental power of a city and its administrative, proprietary or *quasi*-private power to conduct the business affairs and safeguard the interests of the municipality for the advantage or welfare of the city itself and its inhabitants. Justice CARPENTER, who wrote the opinion, carefully reviews and analyzes many of the authorities cited and questions raised—some of which again appear in this contention—and it is distinctly held that between themselves, in the absence of any exercise by the State of its paramount but yet dormant legislative power to regulate rates, the ordinance of the city accepted by the company fixing a rate which the latter might charge for gas constituted a valid binding contract between the parties.

In 1909, by Act No. 300 of that year, the legislature provided for what was known as the Michigan railroad commission, investing it with broad powers as to regulation of carriers, to prevent unreasonable rates, inadequate service, discrimination, etc., similar in some respects but not so extensive, as those subsequently conferred upon the public utilities commission which it afterwards created. In *City of Monroe* v. *Railway*, 187 Mich. 364, a franchise contract between the parties relative to the operation of defendant's railway through the city of Monroe was in issue. The contention was made in behalf of the company that said act operated as a revocation of any power the city might have had to regulate the service of the railroad by contract or otherwise. Of this contention the court said:

"It does not follow that because the contract may yield to the exigency of public necessity, when such exigency has been determined in a proper case and

manner, by competent authority, that the respondent, a party to the contract, may ignore the contract obligation, plead the public or its own convenience as an excuse, and remit the relator to a commission for relief. On the contrary, it seems wholly reasonable that it should perform its contract obligations until relieved therefrom by competent authority."

In *Traverse City* v. *Telephone Co.*, 195 Mich. 373, involving among other things a franchise contract fixing rates, it was held that the statute conferring controlling power over rates upon the railroad commission did not of itself abrogate a contract of that nature, but, accepting it as permissive only and subject to abrogation by exercise of the paramount legislative power of the State, it remained valid and binding between the parties until such time as the reserve State power to control rates was asserted and interposed. This case was again before us in *Traverse City* v. *Railroad Com'n*, 202 Mich. 575, where the right of the State to exercise through the railroad commission its reserved rate-making power against the provisions of the franchise contract was contested by the city and it was said with citation of sustaining authorities that the contract,—

"though binding between the parties to it in the absence of governmental interposition, is to be construed as having been entered into with reference to the right and power of the government to assert and exercise its inherent paramount authority."

It is, however, contended in behalf of plaintiff that none of our Michigan decisions has held that a rate, even though fixed by franchise contract, is enforceable when unreasonable, and urged that in the recent case of *City of Kalamazoo* v. *Kalamazoo Circuit Judge*, 200 Mich. 146, this court has in effect held to the contrary, quoting and particularly emphasizing the following excerpt:

"It seems therefore clearly admissible under the language of the Constitution here under consideration that the municipalities of the State having 'reasonable control of their streets' may fix reasonable conditions for their use by public utilities, and that among such reasonable conditions is the fixing of a reasonable rate. That such conditions must be reasonable, the language of the Constitution clearly demonstrates. *People* v. *McGraw*, 184 Mich. 233. And that the courts may determine the question whether the conditions are reasonable or not, this court has determined. *Michigan Telephone Co.* v. *City of St. Joseph*, 121 Mich. 502 (47 L. R. A. 87)."

It may be noted in the first place that neither of the two authorities cited to sustain those reflections on reasonable rates are gas company cases, which under their charters involve for occupation of streets the "consent of the municipal authorities," nor does either have any relation to a contract of any kind. The *McGraw Case* was a criminal prosecution for violating a city traffic ordinance. It was there said that municipalities did have reasonable control of their streets, and to the extent section 9 of Act No. 318, Pub. Acts 1909, relative to registration, etc., of motor vehicles, forbids cities from reasonable control of their highways it is unconstitutional. The other case involved an attempted arbitrary exercise of legislative power by the city of St. Joseph to impose what was claimed to be unreasonable and prohibitive regulations in the use of its streets by a telephone company, which by statute had a right to use the streets subject only to reasonable rules and regulations by the city as to the manner of installing its line, etc.

In the *Kalamazoo Case* an unquestioned franchise contract between the city and gas company had expired and the city, without consent of the gas company, sought to enact by ordinance and enforce a rate for gas which the company claimed was unreasonable and prohibitive. The issue involved was the right of the city

to so legislate. It was held to be an attempt to exercise a governmental legislative power which the city did not possess. The opinion discusses the various questions raised and reviews the authorities exhaustively, both in this and other jurisdictions, including the *Boerth Case* which is quoted from with apparent approval as well as cases from other jurisdictions to the same effect, and it is pointed out "that the want of power to legislatively fix a rate does not prevent the execution of a contract"; citing and quoting from *City of Noblesville* v. *Improvement Co.,* 157 Ind. 162 (60 N. E. 1032). We discover nothing in that case which questions or modifies any previous decision of this court.

While the exact question of the effect of an unreasonable rate upon a franchise contract is not dwelt upon in the *Boerth Case,* it does appear in the statement of the case that complainant contended the rate charged by the gas company was unreasonable and unjust; and testimony offered to prove the charge unreasonable was not permitted by the trial court because the city had entered into a valid contract permitting defendant to charge 80 cents per thousand for gas furnished to complainant, and later in the opinion it is said: "complainant is not entitled to relief because the rate of 80 cents per thousand cubic feet is too high, for that was the rate defendant was entitled to charge."

In 1919 the legislature of this State passed Act No. 419 abolishing the Michigan railroad commission and creating a public utilities commission vested with the powers and jurisdiction of the abolished commission with authority to take over its unfinished business, and conferring upon said public utilities commission additional rights, powers and duties, "including the fixing of rates and charges of all public utilities within this State producing, transmitting, delivering or furnish-

ing gas for heating or lighting purposes for the public use," but with the limitation that:

"In no case shall the commission have power to change or alter the rates or charges fixed in, or regulated by, any franchise or agreement heretofore or hereafter granted or made by any city, village or township."

To this is added a provision that by mutual consent a municipality and public utility company operating within the limits of the municipality may join in submitting to the commission any question involving the determination or fixing of rates or charges which the commission shall then have jurisdiction to entertain and power to determine. Laws are assumed to be enacted by the legislative body with some knowledge of and regard to existing laws upon the same subject and decisions by the court of last resort in reference to them. That the legislature took cognizance of and prohibited altering without consent of the interested municipality and company *any* franchise or agreement relative to rates gives room for possible inference of ratification or at least approval of contract relations between those bodies touching rates.

But conceding, as contended by plaintiff, that this court has not yet clearly spoken on the subject of franchise contracts and that their validity depends on the agreed rates being reasonable, we think it follows from the fact there was a contract that the question of whether it was reasonable must relate to the time the contract was entered into. In *City of Moorhead* v. *Heat & Power Co., supra,* it is said, with citation of numerous cases:

"These cases all decide that in determining whether equitable relief should be granted with respect to a contract the court must place itself in the position occupied by the parties at the time the contract was made and not at the time at which it was to be per-

formed. If at the time it was made the contract was fair and free from fraud, mistake or imposition, parties must be left free to make their contracts, and it is the duty of the courts to enforce them as made. The same doctrine has been applied to contracts between municipalities and public utility companies."

It is said, and not disputed, that this franchise and all its amendments were agreed upon and enacted on plaintiff's initiative. That of 1915 was upon plaintiff's written proposition of which a contract for lighting the white ways of the city was a part. Both were accepted by the city and by plaintiff in writing. Presumably the rate contract was reasonable at the time it was made and there is no claim to the contrary.

The decree will stand affirmed, with costs to defendants.

Moore, C. J., and Brooke, Fellows, Stone, Clark, and Sharpe, JJ., concurred. Bird, J., did not sit.