Abner POLLOCK and Leo Tessler, d/b/a
Merca Traffic Service Bureau,
Plaintiffs,

v.

OHIO-APEX, Inc., a corporation,
Defendant,

Civ. A. No. 1491.

United States District Court
S. D. West Virginia, Charleston Division.

Sept. 24, 1955.

H. D. Rollins, Charleston, W. Va., for
plaintiffs.

John V. Ray, of Payne, Minor & Ray,
Charleston, W. Va., for defendant.

BOREMAN, District Judge, sitting by special designation.

This is an action on a contract in which the plaintiffs seek to recover the amount claimed to be owing to them from the defendant for services they claim to have rendered in obtaining a reduction in the freight rate on railroad tank car shipments of ethyl hexyl alcohol, sometimes referred to as ethylhexanol, to the plant of the defendant at Nitro, West Virginia.

The plaintiffs are Transportation Specialists with their principal place of business in New York City, in the State of New York. The defendant is a corporation organized and existing under the laws of the State of West Virginia, engaged in the manufacture of plasticisers and other chemical products, with a manufacturing plant and an office located at Nitro, West Virginia.

On January 16, 1948, and for some time prior thereto, the plaintiffs were engaged in the business of auditing railroad freight bills on behalf of the defendant and other shippers and making claims for refunds for railroad freight overcharges, the compensation for the services of the plaintiffs to the defendant to be 50% of the amount recovered from the Railroad Company.

On January 16, 1948, the plaintiffs wrote a letter to the defendant which reads as follows:

"In auditing your freight bills we have, as agreed, investigated the rates applying on your shipments and wish to report that the present freight rate on your carload shipments of Ethyl Hexyl Alcohol or Alcohol Ethyl Hexyl from Charleston, West Virginia to Nitro, West Virginia is unreasonable. Therefore, in addition to obtaining refunds on past shipments, the present freight rate on this traffic should be reduced.

"If you so desire, we will handle this matter and extend this additional service to you as one of our regu-

lar clients, without payment of retainer fee, but in accordance with the terms mentioned in the attached agreement.

"Although this may necessitate the submission of various rates exhibits to the carrier and the Commission, there will be no cost to you for this additional service if our efforts are not successful.

"Please return the original agreement for our records and retain duplicate for your files, and oblige."

The form of agreement mentioned in and sent with the foregoing letter was as follows, except for the signature of Bernard H. Jacobson:

"Merca Traffic Service Bureau
    "Transportation Specialists
        "1126 Westchester Ave.
            "New York 59, N. Y.
                    "January 16, 1948
"No: R–102

"The Merca Traffic Service Bureau agrees to make an analysis of the rate on Ethyl Hexyl Alcohol or Alcohol Ethyl Hexyl' shipped from Charleston, West Virginia to Nitro, West Virginia, with the view of effecting reduction in same, and the subscriber authorizes the Bureau and its employees to conduct any and all necessary proceedings to that end; and also to retain in connection with this matter on our behalf, registered I. C. C. practitioners and/or counsel.

"In remuneration for this additional service, the subscriber agrees to pay to the Merca Traffic Service Bureau, from the amount of savings in freight charges resulting from reduction effected, for a period of two years after said reduction becomes effective, 50% of the amount of such savings. All savings, resulting from such reduction after two years from the date such reduction becomes effective, shall be retained entirely by the subscriber.

"Subscriber Ohio Apex, Inc.
"By Bernard H. Jacobson
"Address Nitro, West Virginia

"Accepted
"Merca Traffic Service Bureau
"Abner Pollock Treasurer"

Two copies of said agreement were received by the defendant, which copies were already signed on behalf of the plaintiffs. Shortly after the agreement was received by the defendant, it was signed on its behalf by Bernard H. Jacobson and the original copy was returned by mail to the plaintiffs.

Ethyl hexanol is an organic alcohol manufactured only by Carbide and Carbon Chemicals Corporation until its patent expired. It is used in the manufacture of dioctyl phthalate, a plasticiser, and is also used in the manufacture of other chemical products. On January 16, 1948, the date of the contract, ethyl hexanol was produced principally at the South Charleston plant of Carbide and Carbon Chemicals Corporation and was being shipped to the defendant from said South Charleston plant. On that date, the railroad freight rate on tank car lots of ethyl hexanol from South Charleston, West Virginia, to Nitro, West Virginia, was 17¢ per cwt., and prior to June 12, 1948, said rate was increased to 21¢ per cwt. according to the plaintiffs, and to 22¢ according to the defendant.

The plaintiffs proceeded with their efforts to obtain a reduction in said railroad freight rates and succeeded in obtaining a reduction on railroad tank car rates on ethyl hexanol to 7¢ per cwt., the reduction to take effect as of June 12, 1948.

During the negotiations of plaintiffs for said reduction, to wit, on April 23, 1948, the plaintiffs wrote the defendant in part as follows:

"We have had considerable correspondence on this matter with The New York Central System, and have

proposed to the carrier the establishment of a basic rate of 7¢ per c. w. t. on this traffic.

"The New York Central System has now requested information relative to the existence of any competitive form of transportation over which these shipments of Ethyl Hexyl can be moved such as truck or water carrier.

"Kindly advise whether you know of such competitive form of transportation, also furnishing a representative copy of shipper's invoice and greatly oblige." (Plaintiff's Exhibit D.)

On May 10, 1948, the defendant replied to this letter as follows:

"We have your letter of April 23rd, in regard to a reduction in the freight rate of Ethyl Hexyl from South Charleston.

"This material can be handled by Tank Truck for $.0044 per gallon or approximately 6¢ per cwt. There is also a possibility that it could be delivered by water but there are no facilities at the present time to handle shipments by water.

"The Tank Truck plan at the rates mentioned above is available now and it is quite possible that we will use this method unless the rail rate is reduced." (Plaintiff's Exhibit E.)

On May 12, 1948, the plaintiffs wrote the defendant as follows:

"We wish to thank you for your letter of 5/10/48 and the information contained therein regarding the movement of Ethyl Hexyl from South Charleston, to Nitro, W. Va.

"We are pleased to advise that we have received further communication from the Assistant Gen. Ft. Agent of the N. Y. C. System advising that the proposal to establish a rate of 7¢ per cwt. on this traffic is now receiving favorable attention.

"We have furnished Mr. Crookshank of the N. Y. C. System with information relating to the availability of tank truck service at the rate of approximately 6¢ per cwt. and believe that the existing competitive situation will favorably impress the carrier in our efforts towards the early establishment of a lower rate by the N. Y. C. System.

"Will you please send us for our file a representative copy of a recent shipper's invoice on one of these shipments and oblige." (Item 2 of defendant's Exhibit No. 12.)

On May 28, 1948, the defendant wrote the plaintiffs as follows:

"In accordance with your request, we are enclosing a copy of an invoice of the Coastal Tank Lines for hauling 2-di Ethyl Hexyl from South Charleston to Nitro. As you will note this is billed in gallons at the rate of 44¢ per hundred gallons which amounts to slightly less than 7¢ per cwt." (Item 1 of defendant's Exhibit No. 12.)

While the third paragraph of the complaint charges that the defendant employed the plaintiffs to make an analysis of the freight charges on ethyl hexyl alcohol (ethyl hexyl) butyl cellosolve and methyl cellosolve with a view of effecting a reduction in such charges, the evidence at the trial and the briefs submitted by the plaintiffs referred only to shipments of ethyl hexyl alcohol, so the issue in this case concerns only railway freight charges on ethyl hexyl alcohol.

On or about May 6, 1948, and apparently pursuant to the suggestion of the plaintiffs in correspondence, the defendant for the first time caused ethyl hexanol to be transported by tank motor truck from the plant of Carbide & Carbon Chemicals Corporation in South Charleston, West Virginia, to its plant at Nitro, West Virginia, by Coastal Tank Lines, Inc. The rate on such shipment was 6.34¢ per cwt., which rate became effective on or about the 1st day of December, 1947.

However, the defendant introduced evidence to the effect that, in the latter part of 1947, its officials were consider-

ing the purchase of a tank motor truck with which to transport materials purchased from Carbide & Carbon Chemicals Corporation from South Charleston to Nitro, and discussed with the local manager of Coastal Tank Lines, Inc., the possibility of purchasing some used equipment. However, they were advised by the local manager of Coastal Tank Lines, Inc., that their idea was not feasible and said manager suggested that the defendant use his company's regular facilities for transporting the chemicals. Apparently the deliveries by tank truck were satisfactory to the defendant as it continued to use that form of transportation all during the period to which the contract applied and from the termination of that period up to the present time.

The defendant contends that the delivery period for tank truck shipments was two or three hours after the order was placed with the truck carrier. The evidence as to the delivery period for rail shipments was conflicting, the plaintiffs' witnesses stating that a railroad tank car shipped one day was delivered the following day, and the defendant's witnesses stating that rail shipments required two to four days. In any event, it is quite evident that delivery of shipments by tank truck was accomplished much more quickly than delivery by rail.

The defendant contends that Carbide & Carbon Chemicals Corporation was unable to supply the amount of ethyl hexanol needed by defendant to satisfy the orders for its finished product. Large quantities of ethyl hexanol were shipped to the defendant by said Chemicals Corporation but were processed for said corporation and returned to it to be used in the manufacture of another product. Occasionally the defendant used some of the ethyl hexanol, which had been delivered for processing and returned to said Chemicals Corporation, in the manufacture of defendant's product but was required to account to said corporation and restore the amount so used from its own supply when later received.

The defendant further contended that it had no facilities for storing ethyl hexanol and the quicker deliveries by tank truck enabled the defendant to operate some manufacturing units which would have been idle from time to time, enabled the defendant to get more productive work from the crew operating the unit, resulting in more efficient and more economical operation of defendant's manufacturing equipment and better service to defendant's customers.

The two-year period contemplated by the contract between the plaintiffs and the defendant was from June 12, 1948, the date of the reduction in railroad freight rates, to June 12, 1950. During that period, ethyl hexanol was shipped by railroad from South Charleston to Nitro on four different occasions and the defendant paid to the plaintiffs the invoice submitted by them for their share of the saving in freight rates.

In the latter part of the year 1948, Carbide & Carbon Chemicals Corporation began the manufacture of ethyl hexanol at its plant at Institute, West Virginia, which is a point on the New York Central Railroad between the City of Charleston, West Virginia, and the defendant's plant at Nitro, West Virginia. The defendant was notified by said Chemicals Corporation that beginning January 1, 1949, the ethyl hexanol purchased by the defendant would be supplied from the Institute plant, and from that date until the end of the contractual period, namely, June 12, 1950, said Chemicals Corporation did not supply any ethyl hexanol to the defendant from its South Charleston plant except a small amount on a few occasions when the plant at Institute was having manufacturing difficulties. Effective on or about November 27, 1948, the New York Central Railroad established a rate of 5¢ per cwt. on ethyl hexanol shipped in railroad tank cars from Institute, West Virginia, to Nitro, West Virginia, but this reduction in rate was accomplished several months after the reduction obtained by the plaintiffs in the rate on rail ship-

ments from South Charleston, West Virginia, to Nitro, West Virginia.

There is no evidence in this case that the defendant expressly agreed to have materials purchased by it shipped to it in any particular manner, or to limit or restrict its right to bring its materials to its plant at Nitro in such manner as it should elect. Certainly the written contract between the plaintiffs and the defendant contains no such agreement. It was evidenced from the correspondence which passed between the plaintiffs and the defendant, prior to the reduction of railroad freight rates, that the plaintiffs had no knowledge as to the existence of an available form of transportation competitive with the railroad (refer to plaintiffs' Exhibit D, letter April 23, 1948, from plaintiffs to defendant).

By letter dated June 4, 1948, plaintiffs' Exhibit J, plaintiffs wrote to defendant as follows:

"We expect that the reduced rate will be published shortly in a supplement to the governing tariff, and would suggest that you continue the movement of this traffic via New York Central Railroad."

This letter was written after the plaintiffs had been advised of the available transportation services furnished by Coastal Tank Lines, Inc.

The plaintiffs contend that the defendant had a duty to notify the plaintiffs of its intention, if any, to change from railroad shipments to tank truck shipments after the execution of the contract and while the plaintiffs were attempting to secure a reduction in railroad rates; that after the reduction in railroad rates was accomplished, the defendant was bound to use railroad tank cars to transport the ethyl hexanol from Carbide & Carbon Chemicals Corporation, either from the South Charleston plant or the plant at Institute; that the defendant is liable to the plaintiffs for 50% of the reduction in railroad freight rates from June 12, 1948, to June 12, 1950, unless the defendant proves by a preponderance of the evidence (1) deterioration in service by the New York Central Railroad to such an extent that performance of the contract by the defendant is excusable; or (2) that there was such a shortage of ethyl hexanol furnished by Carbide & Carbon Chemicals Corporation that orders for carload lots could not be filled.

With the contentions of the plaintiffs, this Court cannot agree. The written contract is clear and unambiguous. The only word in the written contract involved in this action which could be said not to have a certain and definite meaning is the word "rate", but the fact that the only business relationship between the plaintiffs and the defendant prior to the execution of the written contract had been in connection with railroad freight rates, the fact that a study of the defendant's railroad freight bills caused the plaintiffs to solicit the contract, the fact that the defendant had theretofore transported ethyl hexanol only by railroad freight, and the fact that the plaintiffs did nothing under the contract except to persuade the New York Central Railroad to lower a freight rate, make it clear that both the plaintiffs and the defendant intended the word "rate" in the written contract to mean "railroad freight rate".

It has been decided that where, in a letter, words of general and indefinite signification have been used, their meaning will be determined by a consideration, not only of the language used, but of the conditions surrounding the parties at the time, the circumstances under which the letter was written and the purpose sought to be accomplished thereby; and, if the parties have acted under the provisions of such letter, their acts, amounting to a practical construction of it, will be given peculiar weight in arriving at a conclusion as to the meaning of the language used. Osage Gas Co. v. Cleveland, etc., Co., 101 W.Va. 675, 133 S.E. 388, 4 Michie's Jurisprudence 378 (and cases cited in Note 15), Restatement of the Law, Contracts, Sec. 235, subsections (d) and (e).

There is nothing in the written contract, in the letter soliciting the contract or in the situation of the parties which

would indicate that these parties contemplated that the defendant would continue using rail service. The plaintiffs did not ask for, and most certainly did not receive, any assurances that any quantity of ethyl hexanol would be shipped from the South Charleston plant of Carbide & Carbon Chemicals Corporation, or from its plant at Institute, to the plant of the defendant at Nitro after January 16, 1948, the date of the contract, or at any time thereafter. Every word in the written contract, except the word "rate", had a certain and definite import.

Any limitation or restriction on the right of the defendant to select any method of transportation which it might desire cannot be found in or implied from any language in the contract. Nor can such a limitation or restriction be implied from the circumstances existing when the contract was made. The plaintiffs solicited the contract and no representations whatsoever were made by the defendant. The offer was made by mail, the signed contract was returned by mail and there were no oral discussions between the parties.

The plaintiffs contend that the last paragraph of the defendant's letter of May 10, 1948, should be construed as an implied promise on the part of the defendant to use rail transportation if the reduction in rail freight rates was effected. However, this letter was written some months after the original written contract was made and was actually intended to furnish the plaintiffs with a threat to be used to persuade the Railroad Company to reduce the freight rate.

Aside from this discussion, the defendant introduced evidence that sound business judgment was being exercised in changing over from rail transportation to tank truck transportation. This is further evident from the fact that the defendant has continued, up to the present time, to use tank truck transportation in the face of the reduction in railroad freight rates and an increase in tank truck rates. This is strong evidence from which to conclude that the

quick deliveries by tank truck, the more continuous operation of defendant's manufacturing units and the resultant earlier delivery of its manufactured products to defendant's customers were considerations which impelled this defendant to abandon the transportation of ethyl hexanol by rail. It is the opinion of the Court that the plaintiffs are not entitled to recover from the defendant under the contract of January 16, 1948.

The foregoing will be adopted as containing the Court's findings of fact and conclusions of law.

Counsel for defendant is directed to prepare and submit an order consistent with this opinion.