**GEORGE A. KOTEEN ASSOCIATES, INC., Plaintiff,**

v.

**FULTON COTTON MILLS, INC., Defendant.**

**No. 65 Civ. 2054.**

United States District Court
S. D. New York.

Jan. 16, 1970.

Foley, Hickey, Gilbert & Currie, New York City, for plaintiff; John M. Foley, New York City, of counsel.

Regan, Goldfarb, Powell & Quinn, New York City, for defendant; John Galgay, New York City, of counsel.

### OPINION, FINDINGS OF FACT and CONCLU- SIONS OF LAW

LEVET, District Judge.

The above-entitled action by George A. Koteen Associates, Inc. ("Koteen") against Fulton Industries Inc., sued herein as Fulton Cotton Mills, Inc. ("Fulton"), for alleged breach of a utility consultant contract was tried before me without a jury on October 16, 1969.

The action was instituted in the Supreme Court of the State of New York, County of New York, and removed to this court upon petition of the defendant.

The parties have stipulated that, if liability is determined to exist, the amount of damages would be $13,497.43.

Plaintiff, Koteen, is a New Jersey corporation. Defendant, Fulton, is a Georgia corporation. Judge Bryan of this court, in an opinion and order dated June 28, 1967, sustained venue in the Southern District of New York.

After hearing the testimony of the parties, and examining the pleadings, the exhibits and the Proposed Findings of Fact and Conclusions of Law submitted by counsel, I make the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

1. At all times hereinafter mentioned, Koteen was engaged in utility rate consultation; and Fulton was engaged in textile manufacturing in Atlanta, Georgia.

2. On October 25, 1960, the defendant signed plaintiff's standard form of agreement in Georgia, which form was subsequently accepted by plaintiff in New Jersey (see Ex. 1). The contract was prepared by Koteen (SM 117–118). Under the agreement plaintiff was employed as defendant's "utility rate consultant" for a three-year period.

The service rendered by plaintiff to defendant was to include, among other things, the following:

"RATES AND CONTRACTS: Make a thorough analysis of our rates and contracts under which our electric, gas, water, and steam services are being purchased to determine if we are receiving the most favorable rate schedules available. Also advise how we may take full advantage of all provisions, clauses, and special riders in force.

"AUDIT: Audit our past utility bills which have been paid by us, for a period not to exceed one year. When an audit of prior bills in any specific case is warranted, you will audit those prior bills, going as far back as may be necessary. You will also audit our future bills during the life of this agreement.

" * * *

"APPROVAL AND REPRESENTATION: It is understood that we have the right to approve any recommendations, and that all negotiations are to be handled through us unless we instruct you otherwise." (Ex. 1)

The provision for payment to plaintiff was as follows:

"WE PAY YOU NO RETAINER OR ADVANCE FEES OF ANY KIND. We do agree to pay you 50% of all rate reductions which are secured through your efforts, for a period of forty-eight (48) months from the date each reduction actually appears on our bills. We also agree to pay you 50% of any refunds secured through your direction and efforts.

"IF NO RATE REDUCTIONS OR REFUNDS ARE SECURED, YOUR SERVICES COST US NOTHING." (Ex. 1)

3. During the period between December 1960 and November 1961, plaintiff recommended that defendant eliminate or reduce its need for its higher cost "firm"[1] gas supply by installing "suitable" facilities to enable it to utilize substitute fuels during periods when its lower cost "interruptible"[2] gas supply might be curtailed (see Pl.Exs. 3, 4, 9, 13; SM 16–19, 70–74, 98–106).[3]

---

1. "Firm" gas supply meant the gas which the Atlanta Gas & Light Co. ("Atlanta") was required to supply and which Fulton was obligated to accept and pay for at a higher rate than "interruptible" gas.

2. "Interruptible" gas supply referred to the gas which was subject to interrup-

tion by Atlanta and which was charged to Fulton at a lower rate than "firm" gas.

3. Plaintiff's Exhibit 3, letter from plaintiff to defendant, dated December 19, 1960; Plaintiff's Exhibit 4, letter from defendant to plaintiff, dated February 21, 1961

4. The second proposal, according to Koteen, was "to violate the curtailment and pay the penalty which was being applied" (SM 71). Koteen added that "the rate schedule itself permits a violation of [the] curtailment [provisions of the 'firm' gas contract] and provides a penalty clause" (SM 76). As stated by Clarence E. Elsas, president of Fulton between January 1, 1960 and January 1, 1968, the essence of the proposal was that Fulton reduce its "firm" gas commitment and possibly subject itself to penalties which could be imposed by Atlanta if Fulton's use of "firm" gas were to exceed the commitment (SM 144, 159–160).

5. Defendant, however, did not approve either of these recommendations,[4] and neither installed substitute facilities nor risked penalties by violating the "firm" gas curtailment provision. On the contrary, Fulton made a new arrangement with Atlanta, whereby the "firm" gas requirement was reduced to 1500 therms per day with an option to restore the previous minimum of 3000 without any penalty as such; instead, Fulton would make payment at the "firm" rate for any "firm" gas used above the amount of 1500 therms per day. This arrangement became effective in October 1962, with the specific provision that if Fulton found it necessary to go back to 3000 therms per day minimum, Atlanta would amend the contract accordingly without penalty except for the extra gas usage before revision of the contract. After such revision, Elsas said that Fulton was to pay "firm" therm rate on any gas used above the 1500 therms but without further penalties (testimony of Elsas, SM 136, 171–172).

6. The rate, that is, the cost per unit for both "firm" and "interruptible" gas, was not reduced at any time during the period in question[5] (see Pl. Exs. 23, 24, SM 78). Thus, savings were due solely to a change in operation, not to a reduction in rates. There is no provision in the contract providing for payment to plaintiff in the event of a change in operation by the defendant.

7. The plaintiff has failed to prove by a fair preponderance of the credible evidence that the contract in question provided for payment to plaintiff if defendant achieved savings by a reduction of the "firm" gas commitment rather than by any rate reduction.

## DISCUSSION

### I.

 The facts warrant the conclusion that the plaintiff rendered no serv-

---

(indicating (a) plaintiff's recommendation that defendant should investigate the possibility of discontinuing the use of "firm" gas, and (b) defendant's rejection of this proposal because it was not practical); Plaintiff's Exhibit 9, letter from plaintiff to defendant, dated November 21, 1961 (confirming the fact that a conversion was recommended); Plaintiff's Exhibit 13, letter from plaintiff to defendant, dated March 26, 1962 (referring to the elimination of "firm" gas). Each of these letters in evidence confirms Finding of Fact 3.

The testimony of George A. Koteen, for the plaintiff, indicates the same basic facts (see SM 16–19, 70–74, 98–106). Koteen acknowledged that the substance of his main proposal was to cut down "firm" gas and to put in various new pieces of equipment, so as to eliminate any need for "firm" gas. He conceded that defendant never followed this recommendation and that Fulton merely de-

cided to cut down the amount of "firm" gas from 3000 to 1500 therms (SM 73, 74).

Koteen also stated that his firm recommended that defendant build some kind of standby facilities but that defendant did not do it (74); admitted that he did now know what Fulton did (74); and declared that he told a representative of Fulton that he (Koteen) thought it would be better to use steam to heat the air for drying and that infra red could be obtained by means other than gas (99).

4. See clause in contract with respect to approval of recommendations (Finding of Fact 2, above).

5. Indeed, on page 78, Koteen testified that the "firm" rate of 40¢ per therm was applied to the 1500 therms instead of 3000, but that "(t)he rate schedule remained the same * * *."

ices which resulted in a rate reduction. The language of the contract is unambiguous and no rate reductions were secured within the meaning of its terms.

It is elementary that where the terms of a contract are unambiguous their construction is for the court as a matter of law. National Utility Service, Inc. v. Whirlpool Corp., 325 F.2d 779 (2nd Cir. 1963).

The terms "rates" and "rate reductions" are unambiguous as used in this contract.

In the Random House Dictionary of the English Language (unabridged edition), at page 1192, "rate" is defined as follows:

"1. The amount of a charge or payment with reference to some basis of calculation; *a rate of interest on loans.*

"2. A certain quantity or amount of one thing considered in relation to another thing and used as a standard or measure; *at the rate of 60 miles an hour.*

"3. A fixed charge per unit of quantity; *a rate of 10 cents a pound."*

A similar definition is found in Webster's New World Dictionary, College Edition (1964):

"rate, n. [ME., OFr.; L. rata (pars), reckoned (part), fem. of ratus, pp. of reri, to reckon], 1. *the amount, degree, etc. of anything in relation to units of something else:* as, the rate of pay per month, rate of speed per minute. 2. a fixed ratio, proportion; as, the rate of exchange; see exchange, n. 7. 3. a price or value; *specifically, the cost per unit of some commodity, service, etc.: as, an electricity rate, insurance rate.* 4. speed of movement or action: as, he read at a moderate rate. 5. the amount of time gained or lost by a time piece. 6. a class, rank: as, of the first rate. 7. [British], a local property tax. 8. [Obs.], amount; quantity. v. t. [Rated (-id), rating], 1. to estimate the value of, appraise. 2. to put into a particular class or rank. 3. to consider; esteem:

as, he is rated as an important national figure. 4. to determine the rates for shipping (goods), as by rail or air. 5. [Colloq.], to deserve: as, he rates the best. v. i. 1. to be classed or ranked. 2. to have value, status, or rating.—SYN. see estimate. at any rate, 1. in any event; whatever happens. 2. at least; anyway." (Emphasis Added)

Black's Law Dictionary (4th ed.) defines "rate" as follows:

"In connection with public utilities, a charge to the public for a service open to all and upon the same terms. State [ex rel. Public Service Commission] v. Spokane & I. E. R. Co., 89 Wash. 599, 154 P. 1110, 1113, L.R.A. 1918C, 675; City of Detroit v. [Michigan] Public Utilities Commission, 288 Mich. 267, 286 N.W. 368, 373." (pp. 1427-1428)

In Lenawee County Gas & Electric Co. v. City of Adrian, 209 Mich. 52, 176 N.W. 590, 10 A.L.R. 1328, a case which involved rates in a contract proposed by a gas company to a municipality for the supply of gas to the inhabitants, the court wrote:

"Many definitions of the word 'rate' are to be found, but, as involved in the present controversy, it can broadly be said to denote the price stated or fixed for some commodity or service of general need or utility supplied to the public, measured by a specified unit or standard. * * *" (176 N. W. at 592)

"Language is to be given the meaning which the one using it apprehended or should have apprehended that the other party would give to it." 3 Williston on Contracts, Rev.Ed. § 607, p. 1741, and cases cited in note 2 therein.

The case of *National Utility Service v. Thatcher Glass Mfg. Co., Inc.,* 30 A.D. 2d 168, 290 N.Y.S.2d 1002 (First Dept. 1968), cited by counsel for the plaintiff, has no application to the contract provisions here involved. The contract there in question authorized the plaintiff " 'to secure all possible savings and

refunds on our electric * * * rates'." The payment provisions of the contract provided that the plaintiff was to be paid 50% of all savings over a period of 60 months and 50% of all refunds (id. at 169, 290 N.Y.S.2d 1002). The defendant and an electric utility had reached an agreement that a 5% discount was to be applied to billings to the defendant but the utility neglected to apply the discount. The plaintiff detected the oversight and suggested that the defendant call this to the attention of the utility. Immediately upon notice, the utility refunded the overcharge and applied the discount to all future billings. Plaintiff then sought to recover 50% of the refund and 50% of the "savings" brought about by the application of the discount to the billings over the next 60 months. Plaintiff moved for summary judgment, and the Appellate Division, in affirming denial of the motion, held that the use of the terms "savings" and "refunds" in conjunction with the term "rates" created an ambiguity and made the interpretation of the contract provisions a mixed question of fact and law not amenable to resolution of a motion for summary judgment.

In the instant case, the contract contains none of the terms which led the Appellate Division to hold the National Utilities Service contract to be ambiguous. By the terms of its contract, Koteen was employed to analyze rates and contracts in order to secure the most favorable "rate structures," not to secure "savings." Moreover, payment is predicated not on savings but on "rate reductions" secured through Koteen's efforts (Finding of Fact 2, above). There being no ambiguity, the National Utilities case has no application to the present facts.

A case, somewhat similar to the present one, Pollock v. Ohio-Apex, Inc., 136 F.Supp. 712 (S.D.W.Va.1955), has been cited by defendant. In substance, the court there refused recovery under a "rate" analysis contract for freight savings obtained by defendant as a result of shipping by tank truck instead of by railroad.

I conclude that the contract does not provide for any payments to plaintiff on account of savings effected by defendant's reduction of the "firm" gas commitment rather than any rate reduction.

## II.

### INTERPRETATION OF THE CONTRACT: AMBIGUITY

Plaintiff's proposed conclusion of law, par. 7, was as follows:

"The meaning of the term rate reduction in the contract is not ambiguous. The intent of the parties was that the plaintiff was to receive fifty percent of savings for a period of forty-eight (48) months from the date Fulton's monthly utility bills were first reduced provided that the reduction or savings was secured through Koteen's efforts."

However, in plaintiff's trial memorandum, page 6, submitted on September 26, 1969, counsel stated:

" 'We read the compensation clause of the contract to state:

" 'We do agree to pay you 50% of all *savings* [instead of *rate reductions*] which are secured through your efforts, * * *.'

"To repeat we do not concede that the language of the contract is ambiguous. Rather we have stated what we believe the language of the entire contract discloses as the intention of the parties."

Plaintiff's recent references to "reduction or savings" in its proposed conclusion of law, par. 7, and to "savings [instead of rate reductions]" in its trial memorandum, page 6, cannot serve to create any contractual ambiguity where none otherwise exists. As a matter of fact, the contract itself refers to "rate reductions." It does not refer to "reduction or savings" or "savings [instead of rate reductions]" as plaintiff suggests in its memoranda submitted during this litigation.

However, even if it be assumed that the term "rate reduction" as used in the contract was ambiguous, the testimony of Elsas clearly demonstrates that Fulton intended not to enter into any agreement which would obligate Fulton to make payments to Koteen because of any "savings." Specifically, Elsas testified that his intention regarding compensation to Koteen was that "should savings result because of their efforts, that the savings would have to be on the basis of savings in the rates itself, not in increase or decrease in the usage of the product * * *." (SM 148, 151–152).

Furthermore, since plaintiff prepared the contract, the well-settled rule of interpretation clearly would demand resolution against it of any doubt as to the meaning of a term in said contract. This rule is followed by the courts of New York, New Jersey and Georgia. See Rentways, Inc. v. O'Neill Milk & Cream Co., Inc., 308 N.Y. 342, 348, 126 N.E.2d 271 (1955); Paley v. Barton Savings & Loan Assn., 82 N.J.Super. 75, 196 A.2d 682 (1964); Key Life Ins. Co. v. Hodges, 106 Ga.App. 735, 128 S.E.2d 367 (1962); see also Alcoa S. S. Company v. United States, 338 U.S. 421, 70 S.Ct. 190, 94 L.Ed. 225 (1949); Mutual Life Insurance Co. of New York v. Hurni Packing Co., 263 U.S. 167, 174, 44 S.Ct. 90, 68 L.Ed. 235 (1923); California Tanker Co. v. Todd Shipyards Corp., 339 F.2d 426 (2nd Cir. 1964).

Therefore, plaintiff would not in any event be entitled to prevail under all the circumstances of this case.

In view of the foregoing discussion, it is unnecessary to consider defendant's claim that plaintiff's proposal (i. e., that defendant risk the imposition of penalties) was illegal.

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the subject matter of this action.

2. Plaintiff has failed to prove by a fair preponderance of the credible evidence that the contract in question provided for payment to plaintiff if defendant achieved savings by a reduction of the "firm" gas commitment rather than by any rate reduction.

3. Defendant is entitled to judgment on the merits and dismissal of the complaint with costs.

Settle judgment on notice.