**TRANSPORTATION LEAGUE, INC., et al.,
Appellants,**

v.

**MORGAN EXPRESS, INC., Appellee.**

**No. 17187.**

Court of Civil Appeals of Texas.

Dallas.

Jan. 3, 1969.

Rehearing Denied Jan. 24, 1969.

Charles E. Crenshaw, Austin, Morris G.
Cobb, Amarillo, Reagan Sayers, Ft. Worth,

Leroy Hallman, Dallas, Phillip Robinson and Mert Starnes, Austin, for appellants.

Austin L. Hatchell, Johnnie Rogers, Austin, O. D. Montgomery and Frank C. Brooks, Dallas, for appellee.

BATEMAN, Justice.

This case involves the construction of certain language contained in Certificate of Public Convenience and Necessity No. 3063 issued by the Railroad Commission of Texas, herein called "the Commission," to Eli Morgan, predecessor in interest of the appellee Morgan Express, Inc. The appellants are Transportation League, Inc., a trade association, and fifteen regular route common motor carriers operating under the jurisdiction of the Commission. The latter are herein sometimes called "the carrier appellants." Appellants sued for declaratory judgment and for injunctive relief.

A brief history of Certificate No. 3063 will aid the reader in understanding the issues presented by this appeal and our disposition of it. In 1938 Eli Morgan applied to the Commission for a certificate of public convenience and necessity allowing him to transport small packages, weighing a maximum of 50 pounds each, by truck over certain Texas highways. The Commission first denied the application but later granted a motion for rehearing. The carriers which had protested the application sued to set aside the order granting a rehearing; the judgment was favorable to Morgan, and was affirmed in Sproles Motor Freight Line v. Smith, 130 S.W. 2d 1087 (Tex.Civ.App., Austin 1939, writ ref'd). Thereafter, on November 22, 1939, the Commission granted Morgan's application and issued to him Certificate No. 3063. Various Texas common motor carriers, railroads and Railway Express Agency, Inc. unsuccessfully attacked this order by suit in the district court of Travis County, and the judgment was affirmed. Sproles Motor Freight Lines v. Railroad Commission, 157 S.W.2d 949 (Tex.Civ.App., Galveston 1941, writ ref'd w. m.). Appellee eventually became the owner of the certificate and has operated under it since then.

Appellants now contend that appellee's operations under it have been unlawful: (1) In charging rates for transportation of property less than those prescribed by the Commission, resulting in unfair and harmful competition to the appellant carriers; and (2) in not observing departure times set forth in the certificate.

The authority for the Commission to regulate the business of common carriers of property and persons is found in Vernon's Ann.Civ.St., Art. 911b, and violations of the lawful orders of the Commission are, by Art. 1690b of the Vernon's Ann. Texas Penal Code, made criminal offenses.

Appellee's Certificate No. 3063 authorizes it

"TO TRANSPORT:

(Old Cert. 3063)—GOODS, WARES & MERCHANDISE in packages not to exceed fifty (50) pounds each in weight, and NEWSPAPERS, NEWSREELS, FILMS and THEATRE SUPPLIES in packages or bundles of not to exceed one hundred (100) pounds each in weight; and the said transportation not to exceed three thousand (3,000) pounds per single motor truck load.

THE HOLDER of this certificate is authorized to charge a rate for such services, the minimum of which shall not be lower than the lowest maximum rate charged by any other common carrier transporting like commodities over the route, or parts thereof set out hereinafter, and subject to the further rules and regulations of the Railroad Commission of Texas not in conflict herewith."

Immediately following the above quoted portion of the Certificate appear detailed schedules of times of departure from vari-

ous towns authorized by the Certificate to be served, and a list of the public highways to be used in serving them.

Appellants prayed for a judgment declaring *inter alia* that appellee is not authorized under Certificate No. 3063 to transport property for hire as a common carrier (1) other than on rates the minimum of which shall not be lower than the lowest maximum rate charged by any other common carrier transporting like commodities over the routes, or parts thereof, authorized in the Certificate; (2) on schedules and departures from authorized points of service under said Certificate other than specifically authorized therein; and for appropriate injunctive relief. The trial court, sitting without a jury, entered its judgment construing and declaring certain parts of the certificate to have meanings contrary to those alleged by appellants, from which judgment they appeal on five points of error.

 In their first point of error on appeal the appellants urge that the trial court erred in construing the meaning of the word "rate" contained in that portion of the Certificate reading "shall not be lower than the lowest maximum rate charged by any other common carrier" as not comprising the charges made by common carriers such as the carrier appellants, *including a "minimum charge" which the carrier appellants are required to collect.* They argue, for instance, that a single shipment consisting of one package weighing less than 50 pounds, carried less than 100 miles by any of them requires a minimum charge of $3.00, whereas appellee, carrying a package of the same size and weight over the same route and for the same distance, charges substantially less, and that this is competition which they cannot meet and which the Commission did not intend to impose on them. The question raised is: Does the word "rate" as used in Certificate No. 3063 mean a certain figure stated in cents, dollars and cents, or fractions thereof, to be used in computing a carrier's charge on property transported, as contended by appellee, or does it mean a "charge" (including a "minimum charge"), as contended by appellants?

The carrier appellants are required by the Commission to charge for their intrastate transportation services in accordance with what is known as Southwestern Motor Freight Tariff 25-L, a very elaborate and complicated document consisting of several hundred printed pages. On Page 7 of Supplement 15 thereto we find Item 850-D, Part 1 of which is as follows:

## MINIMUM CHARGES

Part 1—Except as otherwise specifically provided herein, or in authorized exceptions hereto—

The minimum charge for a single shipment from one consignor to one consignee on one Bill of Lading shall be:

(A) If classified Class 100 or lower, for 100 pounds at the class or commodity rate applicable thereto; or

(B) If classified higher than Class 100, for 100 pounds at the Class 100 rate; or

(C) If shipment contains different articles, and no article is rated higher than Class 100, for 100 pounds at the class or commodity rate applicable to the articles taking highest rate; or if any one of the articles is rated higher than Class 100, for 100 pounds at the Class 100 rate; but

(D) In no case shall the charge on a single shipment be less than the amount shown in the distance scale below:

(When a shipment moves under a rate made by the combination of separately established rates, the minimum charge in

the scale below will apply to the continuous through movement and not to each of the separately established factors.)

MILES CHARGE MINIMUM

100 and less . . . $3.00
200 and over 100 . . $3.20
Over 200 . . . . . $3.40

It appeared also from the evidence that the only instances in which appellee charged less than the motor freight carriers for transporting identical shipments were those where the motor freight carriers observed the above "minimum charges" and appellee did not. This, in the final analysis, is the "unfair competition" of which appellants complain. They say that the restriction in appellee's Certificate No. 3063, that appellee's minimum rate "shall not be lower than the lowest maximum rate charged by any other common carrier," by implication refers to the above quoted "minimum charges" and requires appellee to impose the same minimum charges. We do not agree with appellants.

The word "rate" is a flexible one with a variety of meanings, and its meaning in a particular instance depends to a large extent upon the context in which it is used. We know from common experience that the words "rate" and "charge" are sometimes used interchangeably as being synonymous. One of the meanings given the word "rate" by Webster's Third New International Dictionary (1966) is:

"A price or charge per unit of freight or passenger service (as cents per hundred pounds or dollars per ton, per car, per passenger-mile); *specif*: a common carrier charge shown on an official published tariff on file with a governmental regulatory agency."

Yet, it has been held that "rate," when used in connection with public utilities generally means "the price stated or fixed for some commodity or service * * * measured by a specified unit or standard."

Lenawee County Gas & Electric Co. v. City of Adrian, 209 Mich. 52, 176 N.W. 590, 592, 10 A.L.R. 1328, 1331 (1920).

Looking again at the tariff provisions under the heading "MINIMUM CHARGES," Part 1, we note that the sub-paragraphs designated as (A), (B) and (C) all provide that the charge for a single shipment must be made for at least 100 pounds. Thus, if the entire shipment consists of a single package weighing only 50 pounds, the shipper is required by the motor freight carriers to pay for 100 pounds; although if the 50 pound package is part of a shipment weighing more than 100 pounds the charge for transporting the package would be determined by its weight. For example, in the latter case, if the tariff rate was $1.00 per 100 pounds, the charge on the 50 pound package would be only 50¢. In this context the words "rate" and "charge" are not synonymous; the charge is what results by applying the rate to the weight of the commodity being transported.

The National Motor Freight Classification No. A-9, prescribed by the Commission for use by the motor freight carriers, contains the following definition of the word "rate" in Section 4(a) of Rule 110 thereof:

"'Rate' means the figures stated in cents, dollars and cents, or fractions thereof, to be used in computing the charge on property transported."

The Commission itself, in its regulation of the rates of railroads, has specified:

"The term 'rate' as used in this classification means the specific figure published in freight tariffs (class or commodity) to be used in computing the charge on property transported."

These two definitions, while not in exactly the same language, have precisely the same meaning; i. e., that a "rate" is only one element used in computing a charge; it is not a charge.

We think it would be unreasonable to say that when the Commission used the word "rate" in the certificate it meant the "charges" of the motor freight carriers. It used the word "rate" in referring to what Morgan was authorized to charge as well as when it referred to what the other common carriers would charge. If the phrase meant the price or charge per unit as to Morgan's compensation, then it must be held to have the same meaning when used in the same sentence in respect of the compensation of the motor freight carriers.

Appellants would have us construe the restriction in the certificate as if it read:

The holder of this certificate is authorized to charge a rate for such services, the minimum of which shall not be lower than the lowest maximum *charges* assessed by any other common carrier, etc. or

The holder of this certificate is authorized to collect *charges* for such services, the minimum of which shall not be lower than the lowest maximum *charges* assessed by any other common carrier, etc.

To follow this suggestion would be, not to construe the certificate, but to rewrite or amend it, and we have no power or authority to do either. We think that if the Commission had intended that the restriction relate, not only to the *rates* charged by the other carriers, but also the minimum charges, it would simply have said so.

Sub-paragraph (D) contains what one witness called a tail-end minimum. It provides: "In no case shall the charge on a single shipment be less than the amount shown in the distance scale below," followed by three minimum charges ranging from $3 to $3.40, depending on distance traveled. Thus, it is seen that sub-paragraphs (A), (B) and (C) provide, in effect, that the shipper must pay for transporting at least 100 pounds regardless of the size or weight of his shipment, or of the distance to be traveled; but if the charge computed according to (A), (B) and (C) does not amount to as much as $3, the shipper must pay a minimum of $3.

Did the Commission intend to impose these minimum charges on Morgan, requiring him in all instances to charge for at least 100 pounds, when in the same certificate it authorized him to transport packages weighing not more than 50 pounds? We are persuaded that it did not. Such would be a strained and unreasonable construction. The Commission knew that Morgan was proposing to furnish a unique service, that of transporting small packages or parcels of not more than 50 pounds each. It also knew that he was proposing to charge the same rates for hauling these small packages by trucks as the Railway Express Agency charged for hauling them in railroad cars. At that time the Commission had already established three set of rates; i. e., for (1) the motor freight carriers (such as appellants), (2) the Railway Express Agency, and (3) the railroads. It could have required Morgan to charge any of these. It had the power to issue the certificate applied for, but on different terms than those requested, and to "impose such reasonable conditions, restrictions and burdens upon the service authorized as it deemed appropriate in the public interest." Miller v. Tarry, 191 S.W. 2d 501, 506 (Tex.Civ.App., Austin 1945, writ ref'd n. r. e.). It did not see fit to prescribe that Morgan's rates should be identical with those prescribed for the Railway Express Agency, as proposed by Morgan, nor those prescribed for any other type of carrier. It did not see fit to fix maximum rates for Morgan, and the only minimum was that quoted and discussed above.

In our opinion the trial court correctly held that the word "rate," as used in the restriction, did not mean the charge made by a carrier for transporting property, but a figure stated in cents, dollars and cents, or fraction thereof, used in computing the charge, and that the phrase "minimum

charge" is not a "rate." Therefore, we overrule appellants' first point of error.

■ In their second point of error appellants complain of the trial court's declaration that the phrase "any other common carrier transporting like commodities over the routes, or parts thereof," is not limited to common carrier motor carriers, such as the appellant carriers, but also encompasses common carrier railroads, express companies, bus lines and forwarders.

Appellants say it is obvious that the words "other common carrier" must refer to a *motor* carrier because the restrictive condition identifies such carrier as one "transporting like commodities *over the routes, or parts thereof, set out hereinafter,*" and such "routes" are thereafter specified by highway designations. They also point out that in its order granting Certificate 3063 the Commission finds that its grant, subject to the restrictions, "will not impair or unreasonably interfere with the services of any existing common carrier *motor* transportation facility *operating for hire over the highways set out in said application,*" and that no other type of common carrier services are referred to in the order. (Italics ours.)

Nevertheless, in the restriction itself the Commission says *"any* other common carrier," when it could as easily have said, if it had meant to limit the phrase as appellants suggest, "any other common carrier motor carrier." Or it could have used the phrase it used in the order and permit involved in W. S. Dickey Clay Mfg. Co. v. Corder, 310 F.2d 764, 766 (5th Cir. 1962), to-wit, "shall not be less than that charged by common carrier motor carriers." The word "any," when used without limiting or qualifying words, is all inclusive; it means one or more indiscriminately from all those of a kind.* We do not doubt that the Commission meant exactly what it said in the Corder case as well as in this.

Appellants' argument, that the phrase must refer to motor carriers because they are the only ones which operate over the "routes" designated by certain highway numbers, is without merit. The word "route" in this connection is not limited to the public highways designated; it means a line or direction of travel between two distant points. The same "route" is often covered by motor trucks and intercity buses traveling over the same or approximately parallel public roads or highways, and also by railroads and the Railway Express Agency operating on steel rails. This is evidently the view of the Commission, for in its order of October 4, 1938, following the first hearing of Eli Morgan's application, it recited this finding:

"That the Sproles Motor Freight Lines, Miller & Miller Motor Freight Lines, Tarry Warehouse and Storage Company and DeShong Motor Freight Lines operate over the route or parts of the route between Dallas and Amarillo. Also that the Fort Worth and Denver City Railroad and other rail lines operate over such route or parts of such route. Also that the Railway Express Agency operates between Dallas and Amarillo serving all points proposed to be served by the applicant."

It is our view that the Commission in using the word "route" had no intention to exclude other ways or means of traversing the same "line or direction of travel," and, accordingly, appellants' second point of error is overruled.

■ By their third point of error the appellants say that the "trial court erred in construing that appellee is not required to operate its trucks so as to depart from the various towns named at the times specified in Certificate 3063, because a contrary declaration should have been made." We see no merit in this point.

Appellants argue that the schedule of times of departure set forth in the original

* Webster's Third New International Dictionary (1966).

Certificate No. 3063 is an integral part of the certificate and that appellee's observance of such times of departure constitutes "a restrictive condition to the granting of Certificate 3063." It was shown without dispute that appellee conducts its operations on schedules different from the departure time schedules set forth in the original certificate, and has filed no application with the Commission seeking a change of such schedules.

It is appellee's position, however, that the schedule of times of departure was included in the original certificate [1] issued in 1939 in compliance with the Commission's practice in effect at that time, but that, since then, the Commission has updated its practice to meet the changing conditions of more modern times, and points out that since the granting of Certificate No. 3063 the Commission has by general order required all common carrier motor carriers to file with the Commission their schedules, it being also provided that the same shall be considered as approved unless expressly disapproved. Under this new policy, a carrier desiring to change one or more of its schedules files new schedules with the Commission. No hearing is held thereon, but the schedules filed by each carrier are kept open to public inspection. The record shows that since Certificate No. 3063 was issued to it, appellee has filed several different schedules, and that these have been accepted by the Commission. On June 18, 1964 the Commission issued a corrected common carrier Certificate No. 3063 to appellee, on the first page of which is contained express authority:

"to operate as a common carrier motor carrier and to render a daily, coordinated motor carrier service in the transportation of commodities generally, to, from and between the cities, towns, villages and communities situated on and along the described portion of the highways and routes below set out, subject to the restrictions below set out, if any, and subject to rates approved by the Commission, on equipment registered with the Commission, *with such frequency of service as is evidenced by schedules filed with the Commission, pursuant to its general orders. Schedules filed with the Commission shall be considered as expressly approved unless expressly disapproved by the Commission.*" (Italics ours.)

The original certificate does not make strict compliance with the schedule of departure times a *condition* to the granting of the certificate, but merely contains the schedules pursuant to the Commission's practice and requirements in effect at that time.

The Legislature has granted the Commission broad and extensive powers "to supervise and regulate the transportation of property for compensation or hire * * on any public highway in this State." Art. 911b, Sec. 4(a), V.A.C.S. This authority is a continuing one, and the legislative grant of power "to prescribe all rules and regulations necessary for the government of motor carriers" clearly gives the Commission the right from time to time to approve or disapprove proposed changes in schedules of times of departure without the necessity of notice and hearings.

We hold that appellee is not required to observe the schedule of departure times specified in its Certificate No. 3063, provided it operates according to schedules filed with the Commission which are not expressly disapproved, and subject to all other rules and regulations lawfully adopted by the Commission from time to time. Appellants' third point of error is overruled.

In their fourth point of error the appellants complain of the finding of the trial court that their cause of action was barred by the four year statute of limitations, that they were estopped to maintain this suit by reason of laches, and that they should take nothing.

The statute relied on by appellee is Art. 5529, V.A.C.S., as follows:

"Every action other than for the recovery of real estate, for which no limitation is otherwise prescribed, shall be brought within four years next after the right to bring the same shall have accrued and not afterward."

We agree with appellants' premise that appellee cannot "acquire new operating rights through prescription or repeated law violations," but in our opinion it does not follow logically that appellants are exempt from the operation of the above quoted statute. Appellants did not file this suit as a civic undertaking to prevent violations of the law by appellee, but as interested parties alleging unfair competition. In such capacity their rights may be barred by limitation the same as those of any private citizen or private corporation. This principle seems to have been recognized by the court in Murphy v. Honeycutt, 199 S.W.2d 298 (Tex.Civ.App., Texarkana 1946, writ ref'd), the question there being, as it is here, when did the statute of limitations begin to run? It was held there, as we hold here, that the statute does not begin to run against the right to maintain a suit for declaratory judgment until an actual controversy has occurred, but that when such dispute or controversy does arise then the cause of action accrues and the statute begins to run. See Anderson on Declaratory Judgments, 2d Ed., Sec. 341, p. 783; also Outlaw v. Bowen, 285 S.W.2d 280, 284 (Tex.Civ.App., Amarillo 1955, writ ref'd n. r. e.).

Appellants' counsel stated at the trial and in their brief that they did not learn "with particularity what Morgan Express was actually doing" until 1963. This suit was filed on August 19, 1966.

Appellants' ignorance of their right to sue, or of facts out of which their right arose, did not prevent or postpone the running of the statute, since it does not appear that there was any fraudulent concealment of such cause of action. 34 Am. Jur., Limitation of Actions, § 230, p. 186.

The rule is thus stated in 37 Tex.Jur.2d, Limitation of Actions § 62, p. 184:

"Generally speaking, and in the absence of fraud, a plaintiff's ignorance or inability to learn of his cause of action will not prevent the statute of limitations from running. It has been stated that where the facts may be ascertained by inquiry or diligence, ignorance of the existence of the cause of action does not toll the statute."

Furthermore, this case was tried by the court without a jury, and no findings of fact or conclusions of law were requested or filed. Under these circumstances, we must assume that the trial court found such facts as were necessary to support its judgment; and under the law the judgment must be affirmed if there is any evidence of probative force to support it upon any theory authorized by law. Hall v. Tucker, 414 S.W.2d 766 (Tex.Civ. App., Eastland 1967, writ ref'd n. r. e.); Beaird v. Beaird, 380 S.W.2d 730 (Tex.Civ. App., Dallas 1964, no writ). The fact that the case involves the construction of a contract does not change the rule. Page v. Superior Stone Products, Inc., 412 S.W.2d 660 (Tex.Civ.App., Austin 1967, writ ref'd n. r. e.), wherein it was also held that it is the duty of the appellate court to resolve any doubts as to facts raised by the evidence in support of the judgment, and to adopt any view of the law which the trial court could have applied under the pleadings and evidence in support of the judgment.

Within these guidelines, and since we find there is some evidence of probative value to support it, we uphold the declaration of the trial court that appellants' alleged cause of action is barred by the four year statute of limitations.

In Texas the general rule is that if the action is one to which a statute of limitations is applicable, then equitable defenses of laches and stale demand do not apply; the statute of limitations governs. 35 Tex.Jur.2d, Laches and Stale Demands, § 6, p. 466. However, appellants contend that their cause of action, which does not seek relief with respect to prior or past operations of appellee, but only seeks to prevent future wrongdoing, is not subject to any statute of limitations, citing Railroad Commission v. Houston Natural Gas Corp., 186 S.W.2d 117 (Tex.Civ.App., Austin 1945, writ ref'd w. m.).

We do not agree with this contention, but even if it were sound we would nevertheless uphold the conclusion of the trial court that appellants are estopped to maintain this action by reason of laches. Laches is an equitable concept, and the trial court, sitting as chancellor, has in effect found that it would be inequitable for appellants to sleep on their rights as long as they did, during which time appellee invested many thousands of dollars in equipment necessary to provide the service authorized by Certificate No. 3063. There was evidence to support the trial court's view in this respect, and we cannot say from this record that there was any abuse of discretion. Therefore, appellants' fourth point of error is overruled.

In their fifth point of error the appellants say the trial court erred in denying the prayed for injunctive relief "to enforce the declaratory judgment it should have rendered." Having upheld the trial court's declaration of the rights and the duties of the parties, we must also uphold his refusal to grant the injunction sought. Accordingly, the fifth point of error is also overruled.

The judgment of the trial court is

Affirmed.