**NETTIE'S FLOWER GARDEN, INC., Plaintiff/Appellant,**

v.

**SIS, INC., Defendant/Respondent.**

No. 62750.

Missouri Court of Appeals, Eastern District, Division Two.

Dec. 21, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 20, 1994.

Application to Transfer Denied Feb. 22, 1994.

William I. Rutherford, Brown & James, P.C., St. Louis, for plaintiff, appellant.

Ben Ely, Jr., Ralph Hart, Kortenhof & Ely, St. Louis, for defendant, respondent.

CRANE, Presiding Judge.

Nettie's Flower Garden, Inc. (Nettie's) appeals from a judgment entered on a jury verdict in favor of defendant SIS, Inc. (SIS)[1] on Nettie's' damage claim alleging SIS's negligence resulted in a failure of Nettie's' computer software to copy data onto backup tapes. We affirm on the grounds that Nettie's failed to make a submissible case.

### FACTUAL BACKGROUND

Nettie's is a retail florist with several locations in St. Louis. In 1982, Nettie's purchased a Rexon computer, with a 56 megabyte hard drive, and software from the Detroit based computer sales company Independent Management Systems, Inc. (I.M.S.). The software package, which included a backup system, was unique. It was specifically designed for retail florists by Roger Kelly, president of I.M.S., who copyrighted this software. I.M.S. trained Nettie's' employees to use the computer and the software, including the backup system. After purchasing the system Nettie's entered into a software maintenance contract with I.M.S., but contracted with SIS, a local company, for hardware maintenance.

In 1984, Nettie's purchased a second hard drive from I.M.S. This drive had 140 megabytes, which it added to its original 56 megabyte hard drive. With I.M.S.'s assistance and instruction, it increased the number of backup tapes it used to six.

In 1986, Nettie's purchased a 140 megabyte drive from SIS to replace the original 56 megabyte hard drive. SIS installed this hard drive through its hardware maintenance representative, Larry Nobs. Because neither Nobs nor Nettie's' then-accountant, Jack Cook, knew how to load the backup tapes, Cook called I.M.S. He informed I.M.S. of the purchase and requested assistance in loading the backup tapes. Cook then gave the telephone to Nobs. The I.M.S. representative instructed Nobs how to load the data back onto the hard drive. Neither Cook, Nobs, nor the I.M.S. representative discussed additional changes to the backup program.

In June, 1987 the computer sustained a headcrash and there was extensive loss of data, including customer accounts stored on the computer. When the parties attempted to retrieve the lost information using the backup tapes, it was discovered that certain backup tapes were blank.

A former I.M.S. employee testified that the backup tapes were blank because the location of data was changed when the 140 megabyte drive replaced the 56 megabyte disk drive. What had previously been logical drives four and five on the 1984 system became logical drives ten and eleven on the 1986 system. However, the backup tapes

---

1. SIS was also referred to at trial and in the judgment as St. Louis Information Systems, Inc. The parties do not contest the use of the two different names for this party.

were still programmed to back up logical drives four and five which no longer contained data, resulting in blank tapes. Accordingly, any data stored on logical drives ten and eleven after June, 1986 was not copied onto the backup tapes.

Nettie's filed a petition against SIS and I.M.S. seeking damages for negligence for failure to change the backup program or warn of the consequences of such failure. Prior to trial, I.M.S. settled with Nettie's. Nettie's proceeded to trial and submitted its case against SIS on the theory that SIS failed to warn it of the necessity of changing its backup program. The jury returned a verdict in favor of SIS on which the trial court entered judgment.

### ISSUES ON APPEAL

*Hearsay*

Nettie's appeals, contending that the trial court prejudicially erred in admitting hearsay. At trial, the court allowed former Nettie's' accountant Cook to testify, over Nettie's' objection, as follows:

> Q. (by Mr. Hart) Did Roger Kelly of I.M.S. make any statements to you about I.M.S.'s responsibilities as far as them being responsible for not having caught this backup problem?
>
> A. (Jack Cook) Yes. He indicated that they should have caught it.

Hearsay is an out of court statement offered in evidence to prove the truth of the matter asserted. *Mattes v. Black & Veatch,* 828 S.W.2d 903, 907–08 (Mo.App.1992). It is ordinarily not admissible unless the statement falls under one of the exceptions to the hearsay rule. At trial, Nettie's objected on the grounds that the statement did not fall within any of the exceptions to the hearsay rule. SIS argued that the statement was both an admission and a declaration against interest. The trial judge overruled the objection on the grounds that the statement was an "admission against interest by the principal [sic] of a co-defendant. . . ." On appeal Nettie's argues that the statement was neither an admission nor a declaration against interest. We agree.

A statement by a party-opponent is an admission and admissible as an exception to the hearsay rule if it meets the following requirements:

> (1) a conscious or voluntary acknowledgment by a party-opponent of the existence of certain facts; (2) the matter acknowledged must be relevant to the cause of the party offering the admission; and (3) the matter acknowledged must be unfavorable to, or inconsistent with, the position now taken by the party-opponent.

*United Services of America v. Empire Bank,* 726 S.W.2d 439, 444 (Mo.App.1987). It is admissible regardless of whether the declarant is available to testify. *Id.*

Nettie's argues that I.M.S. was not a party in this action, and therefore the statements of its officers could not be admitted as admissions of a party. An admission by a party-opponent is made by a party to the litigation or by one in privity with or identified in legal interest with that party. *Carpenter v. Davis,* 435 S.W.2d 382, 384 (Mo. banc 1968).

In this case I.M.S. was neither a party at trial nor in privity with SIS. Privity is the "mutual or successive relationship to the same rights of property." *McMullin v. Borgers,* 806 S.W.2d 724, 732 (Mo.App.1991). The two entities were separate companies and were not in privity. Further, the parties agree that I.M.S. was no longer a party to this action at trial. Thus, the statement cannot be used as an admission of a party-opponent.

SIS responds that the party-opponent exception applies because Kelly admitted making the statement in a deposition (not offered into evidence) taken while I.M.S. was still a party. However, the exception requires that the admission be contrary to the position "now taken" by the party-opponent. *United Services,* 726 S.W.2d at 444. An admission of a party-opponent is admissible because it conflicts with a party's trial position. As stated in *Carpenter,* in an adversary proceeding,

> a party should be held responsible for statements of fact or opinion, previously made, which conflict with the position tak-

en by him in the judicial proceeding. Such statements may affect credibility and proof, and may aid the jury in arriving at the truth. In any event, the declarant is available in court to advance or defend his position.

435 S.W.2d at 384. Thus, the declarant must be a party at the time the admission is offered. Because I.M.S. was not a party at trial, the trial court erred in admitting this statement as an admission of a party-opponent.

Further, the statement was not admissible as a declaration against interest. Declarations against interest are "made by persons not a party or in privity with a party to the suit, are secondary evidence and constitute an exception to the hearsay rule, admissible only when the declarant is unavailable as a witness." *Carpenter*, 435 S.W.2d at 384. A declaration against interest is admissible when (1) the declarant is unavailable as a witness, (2) the declaration, when made, relates to a fact against the apparent pecuniary, proprietary or penal interest of the declarant, (3) the declaration concerns a fact personally cognizable by the declarant, and (4) the declaration is made under circumstances which render it improbable that a motive to falsify exists. *United Services*, 726 S.W.2d at 444.

Nettie's contends that Kelly's statement was an opinion as to fault and not a statement of fact, and therefore not a declaration against interest. An opinion as to fault is not admissible as a declaration against interest. *Carpenter*, 435 S.W.2d at 384–385. *See also, Moore v. Mills*, 623 S.W.2d 586, 589 (Mo.App.1981). Thus, in *Carpenter*, the declarant's statement to the other driver, "[I]t's not your fault", referring to an auto accident in which she was involved, was held to be an inadmissible opinion as to fault. *Id.* The court explained the rationale of this rule as follows:

> An opinion as to fault in a negligence action is particularly susceptible to error. A witness at trial may, intentionally or otherwise, change a word and convey a meaning completely different from that intended by the declarant. An opinion as to fault may be ambiguous, and yet persua-

sive, where, as here, no opportunity exists for explanation or denial.

*Id.* at 384.

In this case, Kelly's reported statement was that "they should have caught it." Under the circumstances this statement was made, it was an opinion as to fault and thus not admissible. The circumstances under which this statement was made do not indicate reliability. The record does not show what prompted Kelly to make his statement. Kelly was not present at Nettie's when the problem occurred and the record does not indicate he ever viewed the computer or tapes. Thus, his statement could not be based on what he observed, but only in response to what Cook or others told him. Further, Cook did not testify to what he told Kelly in that conversation. Given the unreliability of the circumstances in which this opinion was expressed and the ambiguity of the opinion, we do not find any reason not to apply the rule against admission of an opinion to a situation where a witness is testifying to his own fault rather than to someone else's. The trial court erred in allowing Kelly's statement into evidence.

However, the admission of hearsay evidence is reversible error only if the complaining party is prejudiced. *Iota Management v. Boulevard Inv. Co.*, 731 S.W.2d 399, 411 (Mo.App.1987). The appellant has the burden of establishing prejudice. *State ex rel Hwy. & Tr. Com'n v. Cowger*, 838 S.W.2d 144, 146 (Mo.App.1992).

*Submissibility*

SIS argues that the admission of the hearsay statement was not prejudicial because Nettie's failed to make a submissible case. We reach the issue of submissibility because it is a question inherent in deciding whether the evidentiary error merits reversal or remand for new trial. *Grippe v. Momtazee*, 696 S.W.2d 797, 799 (Mo. banc 1985); *Stucker v. Chitwood*, 841 S.W.2d 816, 821 (Mo.App.1992).

To make a submissible case, substantial evidence is required for every fact essential to liability. *Allison v. Sverdrup &*

*Parcel & Assoc., Inc.,* 738 S.W.2d 440, 455 (Mo.App.1987). "Substantial evidence is that which, if true, has probative force upon the issues, and from which the trier of facts can reasonably decide a case." *Hurlock v. Park Lane Medical Center, Inc.,* 709 S.W.2d 872, 880 (Mo.App.1985). Whether evidence in a case is substantial and whether the inferences drawn are reasonable are questions of law. *Id.*

■ In determining whether a plaintiff has made a submissible case, we view the evidence in the light most favorable to that party. *Steenrod v. Klipsch Hauling Co., Inc.,* 789 S.W.2d 158, 171 (Mo.App.1990). We presume the plaintiff's evidence to be true and give the plaintiff the benefit of all reasonable and favorable inferences to be drawn from the evidence. *Loomstein v. Medicare Pharmacies, Inc.,* 750 S.W.2d 106, 112 (Mo.App.1988). However, we do not supply missing evidence or give the plaintiff the benefit of unreasonable, speculative, or forced inferences. *Id.* The evidence and inferences must establish every element and not leave any issue to speculation. *Id.* Further, we disregard defendant's evidence except insofar as it may aid plaintiff's case. *Hurlock,* 709 S.W.2d at 879.

■ A party is bound by the uncontradicted testimony of that party's own witnesses, including that elicited on cross-examination. *Id.* A submissible case is not made if it solely depends on evidence which equally supports two inconsistent and contradictory factual inferences as to ultimate and determinative facts because liability is then left in the realm of speculation, conjecture and surmise. *Loomstein,* 750 S.W.2d at 112; *Hurlock,* 709 S.W.2d at 880.

This case was submitted on the theory that SIS had negligently supplied a dangerous instrumentality for Nettie's' business purposes. The verdict directing instruction, based on MAI 25.10(B) Modified, is as follows:

### INSTRUCTION NO. 7

In your verdict you must assess a percentage of fault to defendant if you believe:

Defendant in June, 1986 supplied a 140 megabyte disk drive for use, and

Second, as a result of defendant's installation of the 140 megabyte disk drive in plaintiff's Rexon Computer the location of the data recorded on the computer was changed causing the backup procedure not to copy the data necessary for effective backup and therefore created a danger of loss of data when put to reasonably expected use, and

Third, the 140 megabyte disk drive was put to reasonably expected use, and

Fourth, defendant knew or in the exercise of ordinary care should have known of such danger, and

Fifth, defendant failed to exercise ordinary care to adequately warn of it, and

Sixth, such negligence directly caused or directly contributed to cause damage to plaintiff.

If Nettie's failed to establish any of these elements, it did not make a submissible case. SIS argues that Nettie's failed to make a submissible case on knowledge, as well as on failure to warn. We agree. Nettie's offered no substantial evidence to support a conclusion that SIS knew or should have known of the danger of possible data loss when it installed the hard drive, or was negligent in failing to warn Nettie's of possible data loss.

Nettie's called five witnesses at trial and read into evidence portions of the deposition of a sixth witness. Its first witness, Wanda Dolansky, Nettie's' former accounts receivable manager, was the person who entered data on Nettie's' computer. She testified that Nettie's bought both the initial hardware and the software for the computer from I.M.S. in 1982. The computer software included a program that instructed her how to insert the tapes and complete the daily backup procedure on the computer. A representative of I.M.S. trained her on how to use this program and told her how many backup tapes to run.

She testified that when Nettie's added another disk drive to the system, it began using three more tapes. I.M.S. reprogrammed the backup system through a modem. After the second disk drive was installed in 1986, she

continued to use the same backup procedure with the six tapes.

She testified that whenever she had a computer problem she would call I.M.S. If it was a software problem, I.M.S. would help her; if it was a hardware problem, I.M.S. would so advise her and recommend she call SIS.

Nettie's' second witness, Jack Cook, was a former accountant at Nettie's who participated in the original purchase of the Rexon Computer from I.M.S. Nettie's purchased the hardware and software as a package from I.M.S. because the software was written specifically for retail florists and could process wire orders and create a data base for advertising. When the computer was installed, a representative of I.M.S. showed him how to copy each day's transactions on backup tapes and explained the importance of using backup procedures. The representative told him to follow the menu on the screen to copy the files onto the tapes.

As part of the purchase, Nettie's entered into a separate hardware maintenance contract with SIS, an independent company. Larry Nobs was Nettie's' SIS maintenance representative. Nobs ordered and installed the replacement 140 megabyte disk drive in 1986. After it was installed, Cook testified that he [Cook] knew "we had to load the data that we had on those backup tapes. The problem was I did not know how to load it and neither did he [Nobs]." Cook called I.M.S. and explained that Nettie's had installed a new hard drive. "I said, 'I have the backup tapes but I don't know how to load them,' and then I, in turn, handed him [Nobs] the phone and they walked him through loading this data back into the new hard drive." Cook further testified,

A. After the drive was installed, after that, he loaded all the tapes and I was apprehensive that we had bought a new— some more hardware, we changed our system and so I asked him the question "do I have to change anything now?", and he said "no, it's ready to go." I was concerned that with the introduction of a new hard drive that something else needed to

be changed. I didn't know. I relied on him to tell me, you know, "do I have to do anything else and if so, what?", and he said "you're ready to go."

Q. Did he say anything to you about backup procedures?

A. No.

Q. Or changing backup procedures?

A. No.

Q. Did you say anything to him about backup procedures or changing backup procedures?

A. I know I wouldn't have known to.

Nettie's' third witness was Joanne House, a former I.M.S. employee who, among other duties, installed systems and wrote programs for I.M.S. She testified ninety-eight percent of I.M.S.'s business was marketing Rexon computers and specialized software programs to florists. She testified that the software programs enabled users to put data into their computers, process it and get it out again, and that I.M.S. had developed a unique program for retail florists. She testified that SIS had no special training in the I.M.S. software.

House trained the Nettie's' personnel in making the backup tapes after the 1982 computer purchase. After I.M.S. sold Nettie's an additional 140 megabyte "add-on" drive in 1984, she went to St. Louis, expanded files, and backed up four tapes and "set up two more tapes to be backed up."[2] She testified that only six tapes were necessary because Nettie's was only using six logical drives, zero, one, two, and three on drive number one, and four and five on drive number two. She said the other logicals were blank and there was nothing on those drives to back up on a tape.

House explained that, when the 140 megabyte drive was installed in 1986 to replace the 56 megabyte drive, "the tapes for zero, one, two, three would have been loaded down to zero, one, two and three." However, the 140 megabyte drive that had been drives four through thirteen became ten through nineteen "so the data that was on four and five

---

2. House testified Nettie's started with four tapes and added two, whereas the Nettie's' employees testified they started with three tapes and added three.

was shoved out to ten and eleven or became ten and eleven, disks ten and eleven." The backup program, however, was set up by I.M.S. to back up disks four and five, which became blank because of the change. After the change the data was being written out to ten and eleven, but the backup program was not set to back up those disks.

She further testified that if an I.M.S. service representative had been given information about the change in drives, "it would have been appropriate to move the data.that was on the original one-forty meg-drive to the corresponding disks, that should have been so on the new one-forty meg-drive." She also testified that I.M.S. had the expertise to restore or reload information to the computer after the disk drive was replaced.

The fourth witness was Frank Kirtian, Jr., Nettie's' president. He testified that Nettie's decided to replace the 56 megabyte disk drive with the 140 megabyte disk drive in 1986 because Nettie's thought it would need the additional disk capacity at some time in the future. He did not testify to any further contacts or dealings with SIS other than those already in evidence.[3]

A portion of the deposition of Charles Whitaker, president of SIS, was read into evidence as part of Nettie's' case. He was asked a series of hypothetical questions about what would happen in accounts in which SIS maintained the *software* where a drive was replaced and the whole system was not backed up. He answered that if such a customer failed to back up its new disk drive and was using the new space, it would lose data if it had a malfunction.

Nettie's argues that there was substantial evidence "to support a finding that SIS knew that the repairs it performed in 1986 would cause a change in the backup operation." It refers to the trial testimony of two of SIS's witnesses and the Whitaker deposition testimony. Nettie's first asserts that Nobs, the SIS maintenance representative, admitted this knowledge. However, the Nobs' testimony to which Nettie's refers, read in context, establishes only that Nobs knew that the logical drive numbers had changed but

he had "no way of knowing how their system backed up data; if something had to be changed in the backup procedure, I would have no way of knowing."

Nettie's also argues that SIS employee John Norton admitted during trial that he was concerned whether a proper backup procedure was being followed and whether Nettie's was using the correct number of tapes to adequately back up its computer. However, what Norton actually testified is that, sometime after July, 1986 and before June, 1987, he had coincidentally been at Nettie's while Wanda Dolansky was doing the backup procedure. He testified:

A.  My observation was that backup procedure was foreign to me. I had never seen that before, taking into consideration I was familiar with backup procedures done on other Rexon equipment, and it was basically totally different than I was accustomed to seeing.

Q.  This is a unique system?

A.  Very unique, yes.

He then testified that he was concerned that Ms. Dolansky was not using the correct number of backup tapes and that she should have had a backup tape for each drive. He also told this to Jack Cook. At a later date, Norton again spoke to Cook who told him Nettie's had contacted I.M.S. "and I.M.S. had assured him they were doing a proper backup with the six tapes." This testimony does not establish that Norton knew or was concerned about a change in the backup program, but was concerned about the number of tapes. Nettie's' own evidence, through Joanne House, established that the problem was not the number of tapes, but how they were programmed to back up specific disks. Thus, Norton's testimony is not a basis for a finding of knowledge regarding a change in the backup program.

Finally, Nettie's argues SIS's knowledge was established by Whitaker's deposition testimony, which Nettie's characterizes as "once a larger disk drive is installed, SIS knew that data loss is possible if backup procedures are not changed." However, the questions to Whitaker were limited to those situations in

---

**3.**  The testimony of Nettie's' fifth witness was not part of the record on appeal.

which SIS was maintaining the software. As Nettie's' own evidence established, SIS was not maintaining Nettie's' software and had no training on it. Whitaker's answer cannot support an inference of what SIS's knowledge would be in a situation where SIS was not maintaining the software. None of the testimony cited by Nettie's supports a finding that SIS knew that the installation of the new drive would cause a backup problem with respect to the I.M.S. software.

Nettie's next argues that the evidence supported a finding that Nettie's relied entirely on its vendors, including SIS, to maintain the computer system and ensure its safety. Actually the testimony cited by Nettie's establishes that Nettie's relied on I.M.S. for its software questions and problems, and SIS for its hardware maintenance. Nettie's also refers us to the testimony that when the 1986 disk drive was installed, Nettie's called I.M.S. to reload the software because Nettie's knew the SIS representative did not know what to do. The testimony reflects that I.M.S. instructed the SIS representative how to reload the software. Cook testified that after the SIS representative followed the I.M.S. instructions, he asked him if he had to do anything else and Nobs replied, "you're ready to go." This evidence shows that Nettie's relied on I.M.S. for software advice and knew that SIS did not know how to load the software. Cook may have asked Nobs if he had to do anything else. However, in view of his knowledge of Nob's unfamiliarity with the I.M.S. software, and Cook's own telephone call to I.M.S., Nettie's could not reasonably have relied on Nobs to advise it of potential software problems.

Nettie's does not argue that any other evidence supports a finding of knowledge or failure to warn. Nettie's failed to adduce substantial evidence on either of these elements. Accordingly, it failed to make a submissible case and was not prejudiced by the erroneous admission of hearsay evidence.

The judgment of the trial court is affirmed.

KAROHL, J., concurs.

CRAHAN, J., concurs in part and concurs in result in separate opinion filed.

CRAHAN, Judge, concurring in part and concurring in result.

Although I have no quarrel with the majority's analysis of the submissibility of Nettie's case against SIS, I would not reach the issue because I find no error in the admission of Roger Kelley's statement to Jack Cook that I.M.S. "should have caught it [the backup problem]." As the majority correctly holds, the statement was not admissible as an admission of a party opponent because I.M.S. was not a party when the statement was offered. When viewed in the context in which the statement was made, however, it was a declaration against interest.

The majority analogizes Kelley's statement to the declarant's statement in *Carpenter v. Davis*, 435 S.W.2d 382, 384 (Mo. banc 1968). There, in response to the witness's statement "I'm sorry, lady, you pulled right out in front of me," the declarant, who died prior to trial, stated "Yes, I know, it's not your fault." The Missouri Supreme Court held that the statement "Yes, I know" would be admissible as a declaration against interest on remand but the portion of the statement "it's not your fault" would be excluded as an expression of opinion. 435 S.W.2d at 384. The bases for excluding the opinion were that the witness at trial might intentionally or inadvertently change a word and convey a different meaning and that the opinion may be ambiguous. *Id.* Also, as one of the dissenting judges pointed out, the decedent might have been too harsh on herself or not in possession of pertinent facts, although this was not viewed by the dissent as a basis for excluding the statement. 435 S.W.2d at 386 (Seiler, J. dissenting). In addition, it is worth noting that the excluded portion of the statement was the decedent's opinion of someone else's fault, not her opinion of her own.

In this case, the disputed statement was made by the president of I.M.S. who (1) authored the software program, (2) was presumably familiar with the division of responsibilities between I.M.S. and SIS, and (3) was confronted by a customer about a problem which had clearly caused major damages. Under such circumstances, the statement "we should have caught it" is a statement of fact personally cognizable by the declarant,

at least insofar as it relates to the division of responsibility between SIS and I.M.S., the key issue in the case. Thus, the proper analogy is not to the portion of the statement in *Carpenter* that "it's not your fault;" the proper analogy is to the statement *Carpenter* held admissible—*i.e.*, "Yes, I know [that I pulled right out in front of you]." It was against I.M.S.'s pecuniary interest to acknowledge that the problem was within its area of responsibility, and the statement was made under circumstances which rendered it improbable that a motive to falsity existed. Kelley resided and worked in another state and was therefore unavailable.[1] Thus, the four part test of *United Services of America v. Empire Bank*, 726 S.W.2d 439, 444 (Mo. App.1987), set forth in the majority opinion was satisfied and the statement was admissible as a declaration against interest. It is therefore unnecessary to address the issue of submissibility.

---

**1.** Conceding the lack of any authority therefor, Appellant argues that the fact that Kelley's deposition had been taken and was on file means that he was not "unavailable." The absence of authority for this contention is readily explained by its circularity. Aside from impeachment, a deposition of a non-party is generally admissible only if the witness is unavailable. Rule 57.07(a)(3). Thus, the availability of a deposition cannot render an absent witness "available."